IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

RALIK HAMILTON,

                    Plaintiff,

            v.

MICHAEL GRAZIANO, Superintendent,
Greene Correctional Facility, *et al.*,

                 Defendants.

_____

Civil Action No.
9:12-CV-0744 (TJM/DEP)

<u>APPEARANCES:</u>

<u>FOR PLAINTIFF:</u>

RALIK HAMILTON, *Pro Se*
12-B-0309
Southport Correctional Facility
P.O. Box 2000
Pine City, NY 14871

<u>FOR DEFENDANT:</u>

HON. ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
The Capitol
Albany, NY 12224

STEPHEN M. KERWIN, ESQ.
Assistant Attorney General

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Ralik Hamilton, a New York State prison inmate, has commenced this suit pursuant to 42 U.S.C. § 1983, alleging deprivation of his rights under the Eighth Amendment to the United States Constitution.  In his complaint, plaintiff asserts that, while incarcerated, the superintendent of the facility in which he was confined at the relevant times was deliberately indifferent to his medical needs by not remedying the failure of prison medical personnel to provide him with antidepressant medication, and that when he complained regarding the matter, a corrections officer at the facility assaulted him.

Defendants have responded to plaintiff's complaint by filing a motion seeking its dismissal, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  For the reasons set forth below, I recommend that the motion be granted as it relates to plaintiff's medical indifference claim, but denied with respect to his excessive force claim.

I.    BACKGROUND[1]

Plaintiff is a prison inmate currently being held in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Compl. (Dkt. No. 1). Although he is now confined elsewhere, plaintiff's claims arise out of his incarceration at Greene Correctional Facility ("Greene"), located in Coxsackie, New York. *Id.*

Plaintiff was transferred into Greene on or about March 12, 2012. Compl. (Dkt. No. 1) § 6. Prior to his arrival there, plaintiff had been receiving prescription medication for depression. *Id.* Once at Greene, plaintiff submitted six requests to be seen by a doctor, presumably to continue his treatment and medication for depression. *Id.* In response, he received a letter from the medical unit at the facility, stating that the prison was understaffed and overcrowded, and that plaintiff would receive a response to his requests shortly. *Id.*

By April 16, 2012, Hamilton's pain had worsened. Compl. (Dkt. No. 1) § 6. He alleges that medical personnel at Greene were aware of his

_____

[1]      In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94 (2007) ("[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint." (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546 (1964).

worsening condition based upon the medical requests and grievances filed by him. *Id.* Plaintiff maintains that, despite his complaints, defendant Michael Graziano, the superintendent at Greene, took no steps to investigate or correct the situation. *Id.* Plaintiff alleges that this failure caused "numerous injuries" and "pain." *Id.*

Plaintiff also complained directly to defendant Fielder, a corrections officer employed by the DOCCS and stationed at Greene, concerning the failure of prison officials to meet his medical needs. Compl. (Dkt. No. 1) § 6. In response, defendant Fielder ordered the plaintiff to stop complaining, utilizing language containing at least one obscenity, and "threw" him to the ground, causing him to suffer bruises on his face. *Id.*

II.   PROCEDURAL HISTORY

Plaintiff commenced this action on May 3, 2012. Compl. (Dkt. No. 1). Plaintiff's complaint names Michael Graziano, the superintendent at Greene, and Corrections Officer Fielder as defendants, and asserts a deliberate medical indifference claim against defendant Graziano, and an excessive force cause of action against defendant Fielder in violation of the Eighth Amendment. Compl. (Dkt. No. 1) § 7. As relief, plaintiff seeks compensatory and punitive damages in the amount of $2.5 million. *Id.* at § 8.

On October 10, 2012, defendants moved requesting the dismissal of plaintiff's complaint. Dkt. No. 16. In their motion, defendants argue that plaintiff's complaint fails to allege facts plausibly suggesting that defendant Graziano was personally involved in any alleged constitutional violation, or that defendant Fielder's alleged use of force was sufficiently serious to abridge plaintiff's rights under the Eighth Amendment. Defendants' motion, to which plaintiff has not responded, is now ripe for determination and has been referred to me for issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c).[2] *See* Fed. R. Civ. P. 72(b).

---

[2] A plaintiff is under no obligation to oppose a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See McCall v. Pataki*, 232 F.3d 321, 322-23 (2d Cir. 2000) (holding that it was error to dismiss complaint solely for failure to file opposition to motion to dismiss under Fed. R. Civ. P. 12(b)(6) without assessing legal sufficiency of complaint ); *Maggette v. Dalsheim*, 709 F.2d 800, 802 (2d Cir. 1983) (holding that it was error to grant motion for judgment on pleadings under Fed. R. Civ. P. 12(c) for failure to oppose motion where pleadings themselves where sufficient to withstand dismissal). This is because a motion to dismiss tests only the legal sufficiency of the plaintiff's complaint; accordingly, since the plaintiff has been afforded a reasonable opportunity to respond to the motion, but has failed to avail himself of that chance, the court may now determine the complaint's sufficiency as a matter of law based on its own reading of the complaint and knowledge of the case law. *McCall*, 232 F.3d at 322-23; *White v. Mitchell*, No. 99-CV-8519, 2001 WL 64756, n.2 (E.D.N.Y. Jan. 18, 2001)

III.    <u>DISCUSSION</u>

A.    <u>Dismissal Motion Standard</u>

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure calls upon a court to gauge the facial sufficiency of that pleading using a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)).  Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. 677-78 (quoting Fed. R. Civ. P. 8(a)(2)).  While modest in its requirements, that rule commands that a complaint contain more than mere legal conclusions.  *See id.* at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations.").

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party.  *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citing *Twombly*, 550 U.S. at 555-56); *see also Cooper v. Pate*, 378 U.S. 546, 546

(1964); *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 300 (2d Cir. 2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint does not apply to legal conclusions. *Iqbal*, 556 U.S. at 678.

To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570); *see also Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge plaintiffs' claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570) (alterations omitted).

When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant, whose complaint is deserving of a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson*, 551 U.S. at 94 ("'[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent

standards than formal pleadings drafted by lawyers.'" (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (internal citation omitted)); *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) ("[W]hen a plaintiff proceeds *pro se*, a court is obliged to construe his pleadings liberally." (internal quotation marks and alterations omitted)); *Kaminski v. Comm'r of Oneida Cnty. Dep't of Soc. Servs.*, 804 F. Supp. 2d 100, 104 (N.D.N.Y. 2011) (Hurd, J.) ("A pro se complaint must be read liberally.").

### B.   Personal Involvement

In their motion, defendants first argue that plaintiff's complaint fails to allege sufficient facts to plausibly suggest defendant Graziano was personally involved in the Eighth Amendment deliberate medical indifference claim. Defs.' Memo. of Law (Dkt. No. 16-1) at 6-7.  Defendants surmise that plaintiff's complaint asserts a claim against defendant Graziano based solely on his position at the apex of the prison hierarchy at Greene.  *Id.*

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)).  In order to prevail on a section 1983 cause of

action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  It is well-established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor, "and [liability] cannot rest on *respondeat superior*." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994). To establish responsibility on the part of a supervisory official such as Superintendent Graziano for a civil rights violation, a plaintiff must demonstrate that the individual (1) directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing the subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring.  *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom. Ashcroft v. Iqbal*, 556 U.S. (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

Here, liberally construed, plaintiff's complaint alleges that he submitted

several requests for medical treatment, including a grievance, and as a result, defendant Graziano "knew of the problems and . . . took no steps to investigate or correct the situation." Compl. (Dkt. No. 1) at § 6. At most, these amount to allegations that defendant Graziano was aware of but ignored his complaints regarding his delayed treatment. *See generally id.* These allegations, however, even if true, are insufficient to establish the requisite personal involvement on the part of defendant Graziano in a deliberate medical indifference claim. *See Parks v. Smith*, No. 08-CV-0586, 2011 WL 4055415, at *14 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y. Sept. 12, 2011) (McAvoy, J.) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement."); *Rivera v. Goord*, 119 F. Supp. 2d 327, 344 (S.D.N.Y 2000) (finding that a plaintiff's allegation that supervisors ignored written complaints was insufficient to find the supervisors personally involved); *Greenwaldt v. Coughlin*, No. 93-CV-6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation . . . is insufficient to hold that official liable for the alleged violations.") (citing, *inter alia*, *Garrido v. Coughlin*, 716 F.

Supp. 98, 100 (S.D.N.Y.1989) (dismissing claim against prison superintendent where the only allegation was that he ignored an inmate's request for an investigation)).[3]  For this reason, I recommend that defendants' motion to dismiss be granted as it relates to plaintiff's deliberate medical indifference claim asserted against defendant Graziano.

C.    Excessive Force Claim

In their motion, defendants next challenge the sufficiency of plaintiff's excessive force claim.  This portion of defendants' motion focuses upon the modest nature of the force alleged, and their contention that it was not sufficiently serious to support an Eighth Amendment violation.

Plaintiff's excessive-force claim implicates the Eighth Amendment, which prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society[,]' or which 'involve the unnecessary and wanton infliction of pain[.]'" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 100-01 (1958) and *Gregg v. Georgia*, 428 U.S. 153, 169-73 (1976) (internal citations omitted)). A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain."  *Whitley v. Albers,*

---

[3]        Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

475 U.S. 312, 319 (internal quotation marks omitted); *Griffin v. Crippen,* 193 F.3d 89, 91 (2d Cir. 1999).

"A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components – one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson,* 503 U.S. at 7-8 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).  To satisfy the subjective requirement in an excessive force case, the plaintiff must demonstrate that "the defendant had the necessary level of culpability, shown by actions characterized by wantonness in light of the particular circumstances surrounding the challenged conduct."  *Wright*, 554 F.3d at 268 (internal quotation marks omitted).  This inquiry turns on "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm."  *Hudson v. McMillian,* 503 U.S. 1, 6 (1992) (internal quotation marks omitted), *accord*, *Blyden*, 186 F.3d at 262.  The Supreme Court has emphasized that the nature of the force applied is the "core judicial inquiry" in excessive force cases – not "whether a certain quantum of injury was sustained."  *Wilkins v. Gaddy*, 130 S. Ct. 1175, 1179 (2010) (per curiam).  Accordingly, when

considering the subjective element of the governing Eighth Amendment test, a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness. *Wilkins*, 130 S. Ct. at 1179; *Hudson*, 503 U.S. at 9.

Additionally, courts must bear in mind that "[n]ot every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights." *Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993) (internal quotation marks omitted); *see also Griffin*, 193 F.3d at 91. "The Eighth Amendment's prohibition of cruel and unusual punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (internal quotation marks omitted).

"The objective component [of the excessive force analysis] . . . focuses on the harm done, in light of 'contemporary standards of decency.'" *Wright*, 554 F.3d at 268 (quoting *Hudson*, 503 U.S. at 8); *see also Blyden*, 186 F.3d at 263 (finding the objective component "context specific, turning upon 'contemporary standards of decency'"). In assessing this component, a court must ask whether the alleged wrongdoing is objectively harmful enough to

establish a constitutional violation. *Wilson v. Seiter*, 501 U.S. 294, 303 (1991), *accord Hudson*, 503 U.S. at 8; *see also Wright*, 554 F.3d at 268. "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency always are violated. This is true whether or not significant injury is evident.'" *Wright*, 554 F.3d at 268-69 (quoting *Hudson*, 503 U.S. at 9) (alterations omitted)). The extent of an inmate's injury is but one of the factors to be considered in determining whether a prison official's use of force was "unnecessary and wanton" because "injury and force . . . are imperfectly correlated[.]" *Wilkins*, 130 S. Ct. at 1178. In addition, courts consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Hudson*, 503 U.S. at 7; *Whitley*, 475 U.S. at 321; *Romano*, 998 F.2d at 105.

In their motion, defendants argue that plaintiff's complaint fails to allege sufficient facts to satisfy the objective component of the excessive force inquiry. More specifically, they maintain that, even assuming plaintiff was shoved by defendant Fielder and as a result suffered a bruised face, such a minor incident is not sufficiently serious to give rise to an excessive force claim.

The fact that the injury allegedly suffered by plaintiff was minor is not dispositive. *See Wilkins*, 130 S. Ct. at 1178 (holding that the district court erred in dismissing the plaintiff's complaint based on the supposedly *de minimis* nature of his injuries). The objective element of the excessive force test may be satisfied even if the use of force is *de minimis* but was "used in a malicious and sadistic manner." *Wright*, 554 F.3d at 268-69. Here, plaintiff's complaint alleges that defendant Fielder threw him to the ground after plaintiff asked him about the status of his request for medical attention. Compl. (Dkt. No. 1) § 6. While it is true that plaintiff alleges he suffered only a bruise as a result of defendant Fielder's actions, at this early procedural juncture, I find that plaintiff has alleged sufficient facts to plausibly suggest that defendant's use of force was "unnecessary and wanton" and not in "a good faith effort to maintain or restore discipline." *Wilkins*, 130 S. Ct. at 1178; *Hudson*, 503 U.S. at 6.

Turning to the subjective element, plaintiff's complaint alleges that defendant Fielder used force against him for no apparent reason. Compl. (Dkt. No. 1) § 6. This allegation, which must be accepted as true when assessing defendants' motion, suggests that defendant Fielder's actions were entirely unprovoked. It does not appear, for example, that defendant

Fielder applied the alleged force to plaintiff in an effort to maintain or restore discipline, since there are no allegations that plaintiff had acted in a manner that required discipline. *See generally id.* Because courts in this circuit have held that a prison guard's unprovoked application of even a *de minimis* amount of force against a prisoner may violate his constitutional rights, I recommend that defendants' motion be denied as it relates to plaintiff's excessive force claim against defendant Fielder*. See Romaine v. Rawson*, 140 F. Supp. 2d 204, 210 (N.D.N.Y. 2001) (Kahn, J.) (holding that both the objective and subjective elements were satisfied where the defendant-prison official struck the plaintiff out of anger because of his disrespectful attitude towards the defendant, even though the plaintiff presented no threat to the defendant); *see also Cicio v. Graham*, No. 08-CV-0534, 2010 WL 980272, at *12 (N.D.N.Y. 2010) (Mordue, J., *adopting report and recommendation by* Peebles, M.J.) (distinguishing the use of force during a period of turmoil when disruptive inmates became unruly with an unprovoked use of force in evaluating the subjective element).

D.    Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed. R. Civ. P. 15(a) (leave to amend "shall be freely given when justice so requires"); *see also Mathon v. Marine Midland Bank, N.A.,* 875 F. Supp. 986, 1003 (E.D.N.Y.1995) (permitting leave to replead granted where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). The court must next determine whether plaintiff is entitled to the benefit of this general rule.

As it relates to the deliberate medical indifference claim against defendant Graziano, the deficiencies in plaintiff's complaint could ostensibly be cured through the inclusion of greater factual detail regarding the superintendent's role in the constitutional violation alleged. Accordingly, I recommend that plaintiff be permitted to amend his complaint, if desired, to address the deficiencies identified in this report as it relates to that claim.[4]

_____

[4]    In the event he chooses to file an amended complaint, it should clearly set forth the facts that give rise to each claim, including the dates, times, and places of the alleged underlying acts, and must identify the individuals who committed each alleged wrongful act. In addition, the revised pleading should specifically allege facts

IV.    SUMMARY AND RECOMMENDATION

Plaintiff's complaint alleges sufficient facts to establish the existence of a plausible excessive force claim against defendant Fielder.  That complaint fails, however, to set forth sufficient allegations of implicating defendant Graziano in plaintiff's claim for deliberate medical indifference under the Eighth Amendment.  Because this deficiency could potentially be cured with the inclusion of additional factual allegations, plaintiff should be granted leave to file an amended complaint in the action.  It is therefore hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 16) be GRANTED, in part, and that plaintiff's deliberate medical indifference claim against defendant Graziano be dismissed, with leave to file an amended complaint that cures the deficiencies identified in this report within thirty days of any order adopting this recommendation, and it is further

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 16) otherwise be DENIED.

_____

demonstrating the specific involvement of each of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations.  *Bass*, 790 F.2d at 263.  Finally, plaintiff is informed that any such amended complaint will replace the existing amended complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted)).

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with clerk of court within FOURTEEN days of service fo this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Roldan v. Racette, 984 F.2d at 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.


Dated:      March 15, 2013
            Syracuse, New York

David E. Peebles
U.S. Magistrate Judge

Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)
(Cite as: 2001 WL 64756 (E.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, E.D. New York.
Antwon WHITE, Plaintiff,
v.
Dr. J. MITCHELL, Arthur Kill Correctional Facility
Health Services Director, Dennis Breslin, Arthur Kill
Correctional Facility Superintendent and Edward
Checkett, D.D.S., Arthur Kill Correctional Facility
Dentist, Defendants.
No. 99-CV-8519 (FB).

Jan. 18, 2001.

Antwon White, Arthur Kill Correctional Facility, Staten
Island, New York, for the Plaintiff, pro se.

Eliot Spitzer, Attorney General of the State of New York,
By: Maria Filipakis, New York, New York, for the
Defendants.

*MEMORANDUM AND ORDER*

BLOCK, J.

**\*1** Plaintiff Antwon White ("White"), a prison inmate,
brings this action *pro se* pursuant to 42 U.S.C. § 1983 and
New York law alleging that defendants were both
negligent and deliberately indifferent to his medical needs
in connection with treatment for hearing loss he suffered
following the extraction of a wisdom tooth. White pleads
that this conduct violated his rights under the Eighth
Amendment, and seeks injunctive relief as well as
compensatory and punitive damages. While White does
not make the distinction clearly, the Court construes the
complaint as naming defendants in both their individual
and official capacities.[FN1] Defendants have moved to
dismiss White's complaint pursuant to Fed.R.Civ.P.

12(b)(6) asserting that (1) the complaint fails to state a
claim under the Eighth Amendment for deliberate
indifference to his medical needs; (2) the complaint fails
to allege personal involvement by defendant Dennis
Breslin ("Breslin"), Superintendent of Arthur Kill
Correctional Facility ("Arthur Kill"); and (3) defendants
are entitled to qualified immunity. Although White has
filed no opposition to defendants' motion, the Court can
decide the motion without the benefit of a submission
from him.[FN2] For the reasons set forth below, defendants'
motion is denied.

FN1. "[T]he plaintiff ... should not have the
complaint automatically construed as focusing on
one capacity to the exclusion of the other."
*Frank v. Relin,* 1 F.3d 1317, 1326 (2d Cir.1993).

FN2. *See McCall v. Pataki,* 232 F.3d 321, 323
(2d Cir.2000) ("If a complaint is sufficient to
state a claim on which relief can be granted, the
plaintiff's failure to respond to a Rule 12(b)(6)
motion does not warrant dismissal").

BACKGROUND

The following facts are drawn from White's complaint and
the records attached thereto, and are accepted as true for
the purposes of this motion: On August 5, 1999, while
incarcerated at Arthur Kill, White had a wisdom tooth
extracted by defendant Edward Checkett ("Checkett"), a
dentist employed at Arthur Kill. Read broadly, the
complaint seems to allege that Checkett was aware that he
negligently injured White during the extraction procedure,
but failed to provide immediate medical attention.

Soon after the extraction, White began experiencing
ringing and hearing loss in his left ear. On several
occasions, White brought these complaints to the attention
of defendant Jennifer Mitchell ("Mitchell"), Arthur Kill's
Health Services Director. However, Mitchell did not
provide White with prompt medical attention, and, in
particular, failed to refer him to an ear specialist.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)
(Cite as: 2001 WL 64756 (E.D.N.Y.))

On November 15, 1999, White filed an administrative complaint, pursuant to the Department of Correctional Services' grievance procedures, requesting medical attention for his hearing problem and, "if necessary," a referral to an ear specialist. Inmate Grievance Complaint attached to Compl. White alleges that Breslin denied his grievance, and "failed to direct his subordinates" to provide White with prompt medical attention.[FN3]

> FN3. Despite White's allegation to the contrary, the Inmate Grievance Resolution Committee ("IGRC") appears to have accepted White's grievance on November 30, 1999, and directed him to "report back to sick-call." Inmate Grievance Complaint attached to Compl.

On December 9, 1999, White was seen by an audiologist who described the degree of hearing loss in his left ear as "severe-profound." NYSDOCS Request & Report of Consultation attached to Compl. The audiologist recommended further medical consultation to determine the etiology of White's hearing loss and approval for a hearing aid evaluation. *See Id.* White filed the complaint in this action on December 23, 1999.

DISCUSSION

I. Standard on a Motion to Dismiss

*2 In considering a motion to dismiss, the court's task is " 'necessarily a limited one.' " *George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). "[I]n ruling on [the] defendant[s'] motion, the court must accept as true all the factual allegations in the complaint and must draw all reasonable inferences in favor of the plaintiff." *Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College,* 128 F.3d 59, 63 (2d. Cir1997). The Court may consider the allegations in the complaint and "all papers and exhibits appended to the complaint, as well as any matters of which judicial notice may be taken." *Hirsch v. Arthur Anderson & Co.,* 72 F.3d 1085, 1092 (2d

Cir.1995). In addition, because White is a *pro se* plaintiff, his pleadings must be read liberally. *See Corcoran v. New York Power Auth.,* 202 F.3d 530, 536 (2d Cir.1999); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). The Court should grant such a motion only if, after viewing the plaintiff's allegations in the most favorable light, it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957); *Feder v. Frost,* 220 F.3d 29, 32 (2d Cir.2000).

II. Section 1983 Individual Capacity Claims

Defendants contend that White's complaint must be dismissed because it fails to state an Eighth Amendment violation. To state a claim under § 1983 for deprivation of medical treatment, a plaintiff must show that the defendant acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). A serious medical need exists where "the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (quoting *Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997)) (internal quotation marks omitted). The Second Circuit has recently held that refusal to treat a degenerative condition that tends to have serious medical implications if left untreated is a sufficient basis to support the existence of a serious medical need. *See Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000) (holding that a tooth cavity may be a serious medical condition).

To establish deliberate indifference, the plaintiff must prove that "the prison official knew of and disregarded the plaintiff's serious medical needs." *Chance,* 143 F.3d at 703 (citing *Farmer v. Brennan,* 511 U.S. 825, 837 (1994)). Deliberate indifference will exist when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer,* 511 U.S. at 847. "Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). "[M]ere medical malpractice' is not tantamount to deliberate indifference," but may rise to the level of deliberate indifference when it "involves culpable

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

recklessness, *i.e.,* an act or failure to act ... that evinces 'a conscious disregard of a substantial risk of harm.' ' *Chance,* 143 F.3d at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks omitted)).

**\*3** White has alleged a "serious medical condition" under *Gamble.* He states that the ringing in his ear developed into a progressive loss of hearing. Indeed, the audiologist's report referred to above characterizes the degree of hearing loss in White's left ear as being "severe-profound."

*Gamble'* s "deliberate indifference" prong is satisfied in respect to each of the defendants in their individual capacities by a reasonably liberal reading of White's *pro se* complaint. With respect to Checkett, White appears to allege that the injury leading to his hearing loss occurred when Checkett negligently extracted his wisdom tooth. Dental malpractice, without more, does not state a claim cognizable under § 1983. White further alleges, however, that Checkett was deliberately indifferent to his medical condition because, once he knew that he had injured White during the extraction procedure, he failed to render timely medical treatment to abate the harm.

As for Mitchell, White alleges that she ignored his subsequent repeated requests for appropriate treatment while his condition worsened, and failed to supervise Arthur Kills's medical personnel in connection with his treatment. Mitchell, therefore, allegedly knew of White's serious medical need, and consciously failed to act to prevent further harm to White.

Finally, Breslin allegedly failed to adequately supervise White's treatment, and denied his grievance. Defendants assert that the complaint must be dismissed as to Breslin because it fails to allege his personal involvement in the Eighth Amendment violation. Because "[s]ection 1983 imposes liability only upon those who actually cause a deprivation of rights, 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " ' *Blyden v. Mancusi,* 186 F.3d 252, 264 (2d Cir.1999) (quoting *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). However, "personal

involvement of a supervisory defendant may be shown by evidence that ... the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong...." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). White alleges that his grievance made Breslin aware that his medical needs were being ignored. White's further allegations that Breslin denied the grievance, and failed to take steps to provide for White's treatment are sufficient to plead Breslin's personal involvement in the violation.

### III. Section 1983 Official Capacity Claims

To the extent White has asserted claims seeking damages against defendants in their official capacities, they are barred by sovereign immunity. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58 (1989). However, the complaint also seeks injunctive relief against the defendants. Injunctive relief may be obtained in a § 1983 action for deliberate indifference to a serious medical need, even absent an official's personal involvement, if the complaint alleges that the official had "responsibility to ensure that prisoners' basic needs were met, and the complaint adequately alleged deliberate indifference to a serious medical need." *Koehl v. Dalsheim,* 85 F.3d 86, 89 (2d Cir.1996); *see also New York City Health & Hosp. Corp. v. Perales,* 50 F.3d 129, 135 (2d Cir.1995) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 102, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984)) ("the Eleventh Amendment does not bar federal courts from issuing an injunction against a state official who is acting contrary to federal law"). White alleges that defendants have denied him treatment for his progressive hearing loss. If he can prove his contentions, he may be entitled to injunctive relief.

### IV. Qualified Immunity

**\*4** The defendants enjoy qualified immunity from White's suit if their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Even where a prisoner's rights are clearly established, "qualified immunity is still available to an official if it was 'objectively reasonable for the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)
(Cite as: 2001 WL 64756 (E.D.N.Y.))

public official to believe that his acts did not violate those rights." ' *Hathaway,* 37 F.3d at 67 (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)).

Defendants contend that their actions were objectively reasonable. (*See* Def. Mem. at 9). However, because the complaint adequately alleges a claim for deliberate indifference, defendants are not entitled to qualified immunity on their Fed.R.Civ.P. 12(b)(6) motion. *See Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996) (the issue when considering qualified immunity in the context of Fed.R.Civ.P. 12(b)(6) "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims"). This allegation, if proved, could constitute a violation of White's Eighth Amendment rights, and more facts are necessary to resolve the qualified immunity question.

## V. State Law Claims

As referred to above, the complaint, liberally construed, also alleges dental malpractice against Checkett and negligent supervision against Breslin and Mitchell in their individual capacities. Although theses claims are not cognizable in an action under § 1983, they do allege state law claims. Defendants do not address these claims in their motion to dismiss. Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over these pendent claims. *See Shimon v. Department of Corr. Serv. for the State of N.Y.,* No. 93 Civ. 3144(DC), 1996 WL 15688, at *3 (S.D.N.Y. Jan. 17, 1996) (Section 24 of New York Correction Law does not bar federal court from hearing pendent state law medical malpractice claim asserted against New York State Department of Correctional Services employee in employee's individual capacity). However, the Eleventh Amendment bars White's claims for damages or injunctive relief against the defendants in their official capacities. *See Edelman v. Jordan,* 415 U.S. 651, 663 (1974); *Fleet Bank, Nat'l Ass'n v. Burke,* 160 F.3d 883, 891 (2d Cir.1998).

## CONCLUSION

Defendants' motion to dismiss is denied.

SO ORDERED.

E.D.N.Y.,2001.
White v. Mitchell
Not Reported in F.Supp.2d, 2001 WL 64756 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph PARKS, Plaintiff,
v.
Joseph T. SMITH, et al., Defendants.
No. 9:08–CV–0586 (TJM/GHL).

March 29, 2011.

Joseph Parks, Wallkill, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Aaron M. Baldwin, Esq., of Counsel, Albany, NY, for Defendants.

### REPORT–RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Joseph Parks alleges that Defendants violated his right to exercise his religion when they disciplined him for attempting to mail a photograph of himself with his hands in what he characterizes as a prayer pose and Defendants characterize as a gang sign. Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 51.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who is now and was at all relevant times an inmate at Shawangunk Correctional Facility ("Shawangunk"), was raised as a Jehovah's Witness, but did not fully accept the religion until 2000 or 2001. (Dkt. No. 51–8 at 6:11.[FN1]) Thereafter, Plaintiff prayed five or six times per day. *Id.* at 22:6–11. Each time he prayed, Plaintiff placed his hands in a meditative hand position. *Id.*

at 17:17–18:5.) He assumed this hand position so that he could "make sure [he] went before [his] Father clean. Not just physically but mentally." *Id.* at 22:16–21. The hand position is not mandated for all Jehovah's Witnesses, but Plaintiff's own research and study led him to believe that he, personally, is required to use the hand position "[b]ecause where I am spiritually and what I know pertaining to the Bible as well as research. What you know holds you accountable." *Id.* at 24:11–17; 25:7–26:6. Plaintiff believes that he cannot pray without using the hand position. *Id.* at 12:13–13:13, 31:3–18.

> FN1. Page numbers refer to the page number assigned by the Court's electronic filing system.

On February 27, 2007, Plaintiff attempted to mail a letter and photograph to a personal ad service. (Dkt. No. 51–4 at 2 ¶ 6.) The photograph depicted Plaintiff, clad in a shirt and red pants, sitting on a chair. (Dkt. No. 51–6; Dkt. No. 51–8 at 16:14–18.) Plaintiff's feet were placed wide apart and his elbows were resting on his thighs. (Dkt. No. 51–6.) His hands were pressed together with his fingertips pointed downward and his thumbs meeting at the top to form a heart or diamond shape. *Id.* At his deposition, Plaintiff testified that he was not praying or meditating when the picture was taken. (Dkt. No. 51–8 at 28:14–16.) Rather, he "was just trying to relax and in the course of just trying to relax," he made the hand sign. *Id.* at 28:14–23. In the letter that accompanied the photograph, Plaintiff indicated that he wanted "to begin a good friendship" with "someone special" and hoped to "find my ideal woman who can complete me ... as I complete her." (Dkt. No. 51–5 at 7.) In the letter, Plaintiff referred to himself several times as a "spiritual" person, but did not mention that he is a Jehovah's Witness. (*Id.;* Dkt. No. 51–8 at 36:3–7.) At his deposition, Plaintiff testified that he included the photograph with the letter to "have a resemblance of me.... [t]o show what I looked like." (Dkt. No. 51–8 at 16:19–23.) In a declaration submitted in opposition to Defendants' motion for summary judgment, Plaintiff states that he "included the photo, not only to show what I look like but to attract someone who practices the same religion I do." (Dkt. No. 55 at 36.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

**\*2** The photograph was taken in the gym at Shawangunk, and DOCS personnel screened it before allowing Plaintiff to leave the gym with it. (Dkt. No. 51–8 at 15:4–23.) However, when Defendant Corrections Officer Kim Skwera, who was assigned to review outgoing inmate mail on February 27, 2007, saw the photograph, she "suspected that the photograph depicted [Plaintiff] making a gang sign with both his hands." (Dkt. No. 51–4 at 2 ¶¶ 6–7.) Based on this suspicion, Defendant Skwera "consulted with [Defendant] Senior Counselor Luis Franco," who had training in these matters and was one of the staff members who regularly reviewed incoming media and other materials to ensure that they do not contain any unauthorized gang material." *Id.* ¶ 8.

There is no written DOCS policy, procedure, or directive governing specifically how to identify gang insignia or materials. (Dkt. No. 51–3 at 3 ¶ 12.) Rather, staff members such as Defendant Franco receive training from the DOCS Central Intelligence/Special Investigations Unit. *Id.* ¶ 13. During this training, staff hear oral instruction and see examples of gang signs and symbols. *Id.* ¶ 15. The training includes "information on particular groups, such as 'The United Bloods Nation,' also known as 'The Bloods,' which is an unauthorized organization that is active and making an adverse impact within DOCS." *Id.* at 4 ¶ 16. Staff learn that "The Bloods original color is RED ... Members' display of hand signs varies depending on the Set they belong to. The most common hand sign is indicated by making a circle with the thumb and index finger, touching at the finger's tip and extending the remainder of the fingers." *Id.* ¶ 17 (emphasis in original).

Based on this training, Defendant Franco concluded that the photograph depicted Plaintiff making a Bloods hand sign. *Id.* at 5 ¶ 22. He reached that conclusion because of the "manner in which the plaintiff is holding his hands together, facing downwards, in a heart or triangular shaped fashion with the fingers and thumbs touching" and because Plaintiff was wearing red pants in the picture. *Id.* at ¶¶ 23–24.

Accordingly, Defendant Skwera wrote a misbehavior report charging Plaintiff with, *inter alia,* violating DOCS

Rule 105.12. (Dkt. No. 51–4 at 2 ¶ 10.) That rule, which has since been repealed, stated that "an inmate shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or display, wear, possess, distribute or use unauthorized organizational insignia or materials." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2 (2004).

The disciplinary hearing regarding the misbehavior report was held on March 2 and 7, 2007. (Dkt. No. 51–5 at 3, 13.) Defendant Lt. G. Gardner served as the hearing officer. *Id.* at 3. Plaintiff alleges that Defendant Gardner "created a hostile environment, using intimidation tactics of taunting and facial gestures." (Dkt. No. 1 at 8 ¶ 16.)

**\*3** Plaintiff called Defendants Skwera and Franco as witnesses. (Dkt. No. 51–5 at 3.) Defendant Skwera testified that she did not speak to anyone other than Defendant Franco about the hand sign. *Id.* at 6. Defendant Franco testified that, based on his experience, Plaintiff's hand position was "clearly ... an unauthorized hand sign." *Id.* at 9. Plaintiff showed Defendant Franco pictures of several meditation hand signs and asked if he was familiar with them. *Id.* at 9–10. Defendant Franco testified that the "only religious ... group that comes close to that type of hand sign ... would be the Rastafarians.... [T]hat's the only one I'm familiar with. I am not familiar with ... meditation ... at all." *Id.* at 12.

Plaintiff told Defendant Gardner that he is a religious man, that there is a religious justification for the hand gesture, and that because he had "been trained for a period of time within my meditation ... I reacted when trying to get calm for the picture ." *Id.* at 12, 14.

Defendant Gardner found Plaintiff guilty of the unauthorized organizations and activities charge. *Id.* at 16. He stated that he relied on Defendant Skwera's report, Plaintiff's testimony that the hand sign was a form of meditation, Defendant Franco's testimony "verifying that the hand sign is that of an unauthorized organization known as the Bloods," and the photograph itself in reaching his decision. *Id.* at 17. He imposed a penalty of fifteen days' keeplock, thirty days' loss of packages and events, and fifteen days' loss of commissary and phone privileges. *Id.* He stated that the reason for his decision

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

was "to impress upon the inmate that unauthorized organizations or displays with the hand signs are prohibited." *Id.*

Plaintiff appealed Defendant Gardner's decision. (Dkt. No. 51–5 at 18.) In his appeal, he stated that the hand sign he made in the photograph was "an unconscious gesture that is relevant to my religious beliefs ... so to find me guilty is to infringe on my Constitutional rights that guarantee[ ] me freedom of religion, and freedom of speech and equal protection under the law." *Id.* at 40. Defendant John Maly, acting as Defendant Superintendent Joseph T. Smith's designee, affirmed the disposition on March 21, 2007. *Id.* at 18.

On March 12, 2007, Plaintiff filed a grievance with Defendant J. Krom, the facility's inmate grievance supervisor, alleging that Defendant Gardner was biased, had deprived Plaintiff of due process, and had deprived Plaintiff of the free exercise of his religion. (Dkt. No 1 at 9 ¶ 21.) Plaintiff also alleged that Defendant Smith allowed "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." *Id.* When Krom did not reply within three weeks, Plaintiff filed an appeal of his grievance with Defendant Smith. *Id.* ¶ 22. When Plaintiff did not receive a reply within four weeks, he appealed to Defendant Thomas G. Egan, the facility's inmate grievance director. *Id.* at 9–10 ¶ 23. Plaintiff did not receive a response. *Id.* at 10 ¶ 24.)

*4 Plaintiff filed the complaint in this action on June 4, 2008. (Dkt. No. 1.) Plaintiff's complaint asserted eight causes of action: (1) a First Amendment free exercise claim or, in the alternative, a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"); (2) a claim that Defendants "retaliated against Plaintiff due to him exercising his right to express his religious views"; (3) a claim under the Equal Protection Clause, claiming that Defendants deprived "Plaintiff[ ] of free exercise of religion, while allowing other religious groups free exercise of religion"; (4) a First Amendment freedom of expression claim; (5) a claim that Defendants violated the Due Process Clause by "refusing to provide [Plaintiff] with a tier hearing consistent with his

constitutionally protected rights"; (6) a claim that Defendants violated the Due Process Clause by failing to respond to his grievance; (7) a claim of racial discrimination; and (8) a claim that Defendants conspired to violate his constitutional rights. (Dkt. No. 1 at 11–12.) Plaintiff requests $1,000.00 for each day he was deprived of his right to practice his religion, the reversal of his disciplinary sentence, and costs. *Id.* at 13.

Defendants moved for judgment on the pleadings. (Dkt. No. 20.) As a result of that motion, the Court dismissed six of Plaintiff's claims. (Dkt. No. 30.) Plaintiff's sole remaining claims are that Defendants violated his religious rights under the First Amendment and RLUIPA and retaliated against him for exercising his religious rights. Defendants now move for summary judgment of those claims. (Dkt. No. 51.) Plaintiff has opposed the motion. (Dkt. No. 55.) Defendants have filed a reply. (Dkt. No. 56–2.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* The nonmoving party must do more than "rest upon the mere allegations ... of his pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

## B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim

**\*5** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Schwartz v. Compagnie Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Id.; accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

## III. ANALYSIS

### A. RLUIPA

Plaintiff claims that Defendants violated his rights under RLUIPA. (Dkt. No. 1 at 11.) RLUIPA provides that

**\*6** [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [FN3] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

> FN3. An "institution" is, *inter alia,* "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1)(B)(ii) (2003).

42 U.S.C. § 2000cc–1(a).

Defendants argue that Plaintiff's RLUIPA claim should be dismissed because (1) Plaintiff was not disciplined for engaging in a "religious exercise"; (2) even if Plaintiff was engaged in a religious exercise, it was not substantially burdened by the misbehavior report and disciplinary sentence; (3) Defendants acted in furtherance of a compelling governmental interest and used the least

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

restrictive means of furthering that interest; and (4) RLUIPA does not authorize money damages. (Dkt. No. 51–10 at 6–13.)

1. *Whether Plaintiff Was Engaged in a Religious Exercise*

Defendants argue that they are entitled to judgment because Plaintiff has not raised a triable issue of fact that he was disciplined for engaging in a "religious exercise." (Dkt. No. 51–10 at 8–9.) I find that Plaintiff has raised a triable issue of fact on this issue.

Under RLUIPA, a "religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Defendants argue that Plaintiff was not engaged in an "exercise" because "[P]laintiff admits that he was neither praying nor meditating in the photograph that gave rise to the misbehavior report." (Dkt. No. 51–10 at 8.)

The evidence shows that while Plaintiff was not actively praying or meditating in the photograph, he has maintained since the incident occurred that his hand gesture in the photograph was the result of his prayer practice. At his disciplinary hearing, he told Defendant Gardner that because he had "been trained for a period of time within my meditation," he "reacted" with the hand sign "when trying to get calm for the picture." (Dkt. No. 51–5 at 12, 14.) Plaintiff testified at his deposition that he "fell into [his] meditation gesture unconsciously" as he was "trying to relax for the picture." (Dkt. No. 51–8 at 29:7–11.) Defendants have not cited, nor can I find, any case law discussing whether such an unconscious manifestation of one's faith (which seems akin to the practice of some Catholics to reflexively cross themselves in moments of stress) is an "exercise" within the meaning of RLUIPA. Because the burden on a motion for summary judgment is on the moving party, and because I must view the facts in the light most favorable to Plaintiff, I therefore find that Defendants have not established as a matter of law that Plaintiff was not engaged in an "exercise" of religion.

Defendants argue that even if Plaintiff was engaged in an "exercise," it was not "religious" because (1) the Jehovah's Witness religion does not require adherents to

assume any special position when praying; and (2) the way Plaintiff is holding his hands in the photograph is different than the hand poses depicted in the book from which Plaintiff says he adopted the prayer practice. (Dkt. No. 51–10 at 8–9.)

**\*7** Courts analyzing RLUIPA claims use the First Amendment "sincerely held religious beliefs" standard to determine whether a plaintiff was engaged in a "religious" exercise. *See, e.g., Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007). Under that standard, a religious belief is "sincerely held" when the plaintiff subjectively and sincerely holds a particular belief that is religious in nature. *Ford v. McGinnis,* 352 F.3d 582, 590 (2d Cir.2003).

Courts have routinely expressed reticence about deciding, on summary judgment, whether or not an individual's beliefs are sincere. As the Second Circuit has noted, "the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs" because the "[s]incerity analysis is exceedingly amorphous, requiring the factfinder to delve into the claimant's most veiled motivations...." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984).

The fact that the prayer gesture employed by Plaintiff is not mandated by any central authority of the Jehovah's Witness faith is immaterial to the sincerity analysis. As the Supreme Court has noted:

Intrafaith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses.... [T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether [a party or another member of his faith] more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Bd. of the Indiana Empl. Sec. Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

624 (1981) (holding that one Jehovah's Witness's belief that his religion prevented him from working in area of factory that produced tank turrets was sincere, despite fact that another Jehovah's Witness believed that such work did not violate the faith).

Similarly, I cannot conclude as a matter of law that Plaintiff's conduct was not sincere because his hand position in the photograph did not perfectly match the pictures in the book from which he adopted the pose. As a matter of fact, of course, a reasonable juror could consider this issue and conclude that the imperfection of the hand pose is evidence that Plaintiff's assertion is insincere and that he was, in fact, making a gang sign. But a reasonable juror could also conclude that the imperfection of the hand pose supports Plaintiff's claim that he unconsciously assumed the position, honed from years of using it to pray five or six times per day, in order to relax. But as a matter of law, I cannot credit one interpretation over the other. The Supreme Court has cautioned that the "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit ... protection." *Thomas,* 450 U.S. at 714. Further, "[c]ourts should not undertake to dissect religious beliefs because the ... [plaintiff's] beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 715.

**\*8** Finally, I note that *Farid v. Smith,* 850 F.2d 917 (2d Cir.1988), cited by Defendants, is distinguishable. In that case the plaintiff "neither alleged nor submitted any proof that he sincerely h[eld] to any religious belief that mandates the use of Tarot cards ..." *Farid,* 850 F.2d at 926. Here, Plaintiff has maintained since before filing this lawsuit that the hand gesture in the photograph was religious in nature and has submitted voluminous declarations to that effect.

Therefore, I find that Plaintiff has raised a triable issue of fact that he was engaged in a "religious exercise."

2. *Substantial burden*

RLUIPA prohibits only government action that places a "substantial burden" on religious exercise. 42 U.S.C. § 2000cc–1(a). Defendants argue that even if Plaintiff was

disciplined for engaging in a religious exercise, that punishment did not place a "substantial burden" on Plaintiff. (Dkt. No. 51–10 at 9–11.) I find that Plaintiff has raised a triable issue of fact on this issue.

A prisoner's sincerely held religious belief is substantially burdened "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (punctuation omitted).

Defendants argue that Plaintiff's religious exercise has not been substantially burdened because Plaintiff can still pray in the privacy of his living quarters or "in designated religious areas whenever feasible as determined by the Superintendent" and because "Plaintiff is allowed to use ... meditation poses ... while praying ...." (Dkt. No. 51–10 at 10.) Defendants cite Defendant Franco's declaration as support for the latter assertion. In the cited paragraph, Defendant Franco declares that "Plaintiff would be allowed to use those 'meditation poses' depicted in his Complaint while praying ..., *which poses are different from that unauthorized group symbol made by the plaintiff in the photograph* ...." (Dkt. No. 51–3 at 6 ¶ 33, emphasis added.) In other words, Defendants argue that Plaintiff's religious exercise has not been substantially burdened because he can still pray, but only if he does it in designated areas and only so long as he does not use the prayer gesture he unconsciously assumed on February 27, 2007. I cannot find as a matter of law that such restrictions do not place substantial pressure on Plaintiff to modify his behavior and to violate his beliefs. A reasonable juror could conclude that this pressure was substantial, and another reasonable juror could conclude that this pressure was not substantial. Therefore, Plaintiff has raised a triable issue of fact that Defendants substantially burdened his religious exercise.

3. *Least Restrictive Means of Furthering a Compelling Governmental Interest*

Under RLUIPA, government officials may substantially burden an inmate's religious exercise if they are motivated by a compelling governmental interest and use the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–1(a). The burden of proving this element is on Defendants. *Redd v. Wright,* 597 F.3d 532,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

536 (2d Cir.2010) ("[T]he state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest.").

**\*9** Defendants argue that they were motivated by the compelling governmental interest of preventing gang activity and that their "zero tolerance" policy is the least restrictive means of furthering that interest. (Dkt. No. 51–10 at 11.) Defendant Franco's declaration discusses, at length, the security problems posed by gang activity within the DOCS system. Defendant Franco declares that "DOCS has seen an increase" in gang activity "in recent years that has compelled the Department to take steps to slow the growth of these groups and monitor them closely." (Dkt. No. 51–3 at 2 ¶ 5.) Defendant Franco declares that gangs:

> often use seemingly innocuous but covert means of identifying themselves and communicating with other members both within and outside correctional facilities. These include the use of code words, slang, hidden messages (sometimes contained in letters or newspaper classified advertisements), and signs, symbols, and insignia which can range from anything [from] wearing certain color clothing or jewelry, to tattoos, and the use of hand signs, symbols and gestures, whether in person or in photographs.

> *Id.* ¶ 6.

"Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007). Courts must be sensitive to these interests and apply RLUIPA's "compelling interest" standard "with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources.' " *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). This, however, does not end the inquiry.

In *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009), the Second Circuit noted with approval that "[o]ther circuits have ... recognized that the state may not merely reference an interest in security ... in order to justify its actions...." Indeed, "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RLUIPA's] requirements." *Id.* at 416 (quoting 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy on RLUIPA)). The Second Circuit also noted with approval that "[o]ther circuits ... have required that, for a state to demonstrate that its practice is the least restrictive means, it must show that it 'actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.' " *Id.* (quoting *Warsoldier v. Woodford,* 418 F.3d 989, 999 (9th Cir.2005)). As another district court has noted, *Jova* thus suggests that Defendants are required to present evidence of having considered less restrictive practices. *Forde v. Baird,* 720 F.Supp.2d 170, 180 (D.Conn.2010).

**\*10** Defendant Franco declares that an "absolute ban or 'zero tolerance policy' enforceable through the disciplinary system when rule violations occur for displaying, wearing, possessing, distributing or using unauthorized organizational insignia or materials is the only way that DOCS can meaningfully attempt to prevent and curtail unauthorized group activity in this regard in correctional facilities." (Dkt. No. 51–3 at 3 ¶ 9.) Otherwise, he states:

> it would be unduly burdensome on facility staff, if not impossible, to prevent the unlimited dissemination or use of unauthorized organizational insignia or materials throughout the correctional systems which would be highly dangerous. Without a zero tolerance policy, the prohibitions could also be applied ... inconsistently from one situation to another.

> *Id.* ¶ 10.

Although this is a close question, I find that Defendant Franco's declaration adequately meets Defendants' burden of showing, as a matter of law, that they had a compelling interest and used the least

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

restrictive means to further that interest when they disciplined Plaintiff for attempting to mail a photograph of himself wearing red pants and making a hand gesture that resembled one used by the Bloods. If Plaintiff had been punished simply for making the hand sign, particularly in his cell or in some other area designated for inmate prayer, I would likely recommend that the Court deny Defendants' motion for summary judgment. However, Plaintiff was attempting to disseminate the photograph and, in DOCS' experience, gang members sometimes use hidden messages in newspaper classified advertisements to communicate. (Dkt. No. 51–3 at 2 ¶ 6.) Accordingly, applying the due deference I must give to prison administrators in establishing necessary procedures to maintain security, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's RLUIPA claim.

5. *Availability of Money Damages*

Defendants argue that even if Plaintiff had raised a triable issue of fact and could proceed to trial on his RLUIPA claim, he would be entitled only to injunctive relief. (Dkt. No. 51–10 at 13.) Defendants are correct.

RLUIPA allows prevailing plaintiffs to recover "appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). The United States Courts of Appeals are divided on the issue of whether "appropriate relief" includes money damages. *Compare Madison v. Commonwealth of Virginia,* 474 F.3d 118, 131–32 (4th Cir.2006) (money damages not available) *with Smith v. Allen,* 502 F.3d 1255, 1265 (11th Cir.2007) (money damages available). The Second Circuit has not resolved the issue. The consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord,* 571 F.Supp.2d 477, 506–09 (S.D.N.Y.2008). The issue is currently pending before the Supreme Court in *Sossamon v. Texas,* 560 F.3d 316 (5th Cir.2009), *cert. granted* ––– U.S. ––––, 130 S.Ct. 3319, 176 L.Ed.2d 1218 (2010) (argued Nov. 2, 2010). In the event that the District Court concludes that Plaintiff has raised a triable issue of fact as to his RLUIPA claim and, at that time, the Supreme Court has not yet issued a decision in *Sossamon,* I would recommend that the Court allow only Plaintiff's RLUIPA claim for injunctive relief to proceed.

**B. Free Exercise Clause Claim**

**\*11** Plaintiff claims that Defendants violated his First Amendment right to freely exercise his religion. (Dkt. No. 1 at 11.) Defendants argue that they are entitled to summary judgment dismissing Plaintiff's claim, for the same reasons that they asserted regarding the RLUIPA claim. (Dkt. No. 51–10 at 6–13.) Defendants are correct.

Under the Free Exercise Clause of the First Amendment, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (punctuation omitted).

To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens [FN4] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595) (punctuation omitted). When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

FN4. Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

Here, as discussed above, Defendants have established that they are entitled to judgment under the strict RLUIPA compelling interest standard. Accordingly, they are also entitled to judgment under the less stringent First Amendment standard. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claim under the Free Exercise Clause.

**C. Retaliation**

Plaintiff claims that Defendants retaliated against him for exercising his right to freely exercise his religion. (Dkt. No. 1 at 11.)

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims

of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

**\*12** [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001)).

Defendants argue that Plaintiff's conduct was not protected because Plaintiff "was not praying or meditating in the photograph which led to the misbehavior report." (Dkt. No. 51–10 at 11–12.) As discussed above, Plaintiff has raised a triable issue of fact that he was engaged in a religious exercise in the photograph. Therefore, I find Defendants' argument regarding the first prong to be without merit.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Regarding the second prong, Defendants concede that "the misbehavior report constitutes adverse action ..." (Dkt. No. 51–10 at 11.)

Regarding the third prong:

[t]o satisfy the causal-connection prong of a retaliation claim, an inmate must show that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. The court may consider a number of factors when determining whether a causal connection exists, including (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.

*Vega v. Artus,* 610 F.Supp.2d 185, 207 (N.D.N.Y.2009) (citations and punctuation omitted) (Suddaby, J.).

Here, there is simply no evidence in the record from which a reasonable juror could conclude that Defendants were substantially motivated by Plaintiff's religion. Defendants Franco and Skwera have both filed declarations stating that they were not aware of Plaintiff's religion until they heard him testify at the disciplinary hearing. (Dkt. No. 51–3 at 5–6 ¶¶ 27–30; Dkt. No. 51–4 at 4–5 ¶¶ 21–25.) Although Defendant Gardner was aware of Plaintiff's faith when he found Plaintiff guilty of the disciplinary charge, there is no evidence in the record that he was substantially motivated by Plaintiff's religion to punish Plaintiff. Although the complaint characterizes Defendant Gardener's conduct at the hearing as "hostile" and "intimidating" (Dkt. No. 1 at 8 ¶ 16), nothing in the transcript indicates that Defendant Gardener said anything derogatory about Jehovah's Witnesses or people who use hand poses to pray. As for the other defendants, Plaintiff asserts that they must have known about his religion because, when he became a Jehovah's Witness, he filled out a form designating Jehovah's Witness as his religion. (Dkt. No. 51–8 at 6:2–20.) However, there is no evidence that any of the named defendants were aware of that form. Accordingly, I find that Plaintiff has not raised a triable

issue of fact that there was a causal connection between his protected conduct and the adverse action. Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's retaliation claim.

**D. Personal Involvement**

*13 Defendants argue that, even if Plaintiff had raised a triable issue as to any of his substantive claims, the claims against several Defendants should be dismissed for lack of personal involvement. (Dkt. No. 51–10 at 18–22.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN5]

FN5. In *Ashcroft v. Iqbal,* ––– U.S. –––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that *Colon* remains good law.

1. *Claims Against Defendant Smith*

Plaintiff claims that Defendant Smith violated his constitutional rights by (1) designating Plaintiff's appeal of the disciplinary decision to Defendant Maly, who then affirmed the decision (Dkt. No. 1 at 9 ¶¶ 19–20); (2) ignoring Plaintiff's grievance (Dkt. No. 1 at 9–10 ¶¶ 22–23); and (3) allowing "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Even if Plaintiff had raised a triable issue of fact as to his substantive claims, he has not raised a triable issue of fact that Defendant Smith was personally involved.

Regarding the appeal, the evidence shows that Defendant Smith personally took no action at all. Even if he had handled Plaintiff's appeal personally rather than designating the task to Defendant Maly, courts have held that "merely affirming the hearing determination is not a sufficient basis to impose liability." *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309, at *2–3 (W.D.N.Y. Dec.7, 2009).[FN6] Although the Second Circuit once held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allow the case to survive summary judgment [FN7], district courts in this Circuit have often distinguished that case by noting that liability only attaches if the supervisory official "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Woodward,* 2009 WL 4730309, at *2–3. Here, there is no evidence that

Defendant Smith proactively participated in the review.

FN6. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

FN7. *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

**\*14** A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement. *Rivera v. Goord,* 119 F.Supp.2d 327, 344–45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Thus, Defendant Smith's alleged failure to respond to Plaintiff's grievance does not constitute personal involvement.

Finally, Plaintiff has not produced any evidence of "a pattern of unchecked, unconstitutional conduct" at hearings, much less any that occurred "due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Therefore, Plaintiff has not raised a triable issue of fact that Defendant Smith was personally involved in any alleged constitutional violations.

2. *Claims Against Defendant Maly*

Plaintiff's only claim against Defendant Maly is that he affirmed the disciplinary conviction. (Dkt. No 1 at 9 ¶¶ 19–20.) As discussed above, such a claim is insufficient to establish personal involvement unless there is evidence that the defendant was proactively involved in the appeal. Here, there is no such evidence regarding Defendant Maly. Therefore, Plaintiff has not raised a triable issue of fact that Defendant Maly was personally involved in any alleged constitutional violations.

3. *Claims Against Defendants Krom and Egan*

Plaintiff's only claim against Defendants Krom and Egan is that they ignored his grievance. (Dkt. No. 1 at 9–10 ¶¶ 22–24.) As discussed above regarding Defendant

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Smith, this is insufficient to establish personal involvement. Therefore, Plaintiff has not raised a triable issue of fact that Defendants Krom and Egan were personally involved in any alleged constitutional violations.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk provide Plaintiff with a copy of *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309 (W.D.N.Y. Dec.7, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 51) be ***GRANTED.***

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.

Parks v. Smith
Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)

(Cite as: 2011 WL 4055414 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph PARKS, Plaintiff,
v.
Joseph T. SMITH, et al., Defendants.
No. 9:08–CV–0586 (TJM/GHL).

Sept. 12, 2011.

Joseph Parks, Wallkill, NY, pro se.

Aaron M. Baldwin, New York State Attorney General, Albany, NY, for Defendant.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. INTRODUCTION**

**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. George H. Lowe, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S .C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In his March 29, 2011 Report–Recommendation, Magistrate Judge Lowe recommended that Defendants' motion for summary judgment (Dkt. No. 51) be granted. Plaintiff has filed objections to this recommendation.

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v. N.Y.C.,* 2009 WL 465645 at \*2 (S.D.N.Y. Feb.25, 2009).[FN1] After reviewing the Report–Recommendation,

the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

> FN1. The Southern District wrote in *Frankel:*
>
> The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings. *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report strictly for clear error. *See Pearson–Fraser v. Bell Atl.,* No. 01 Civ. 2343, 2003 W L 43367, at \*1 (S.D.N.Y. Jan. 6, 2003); *Camardo v. Gen. Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992). Similarly, "objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review." *Vega v. Artuz,* No. 97 Civ. 3775, 2002 W L 31174466, at \*1 (S.D.N.Y. Sept.30, 2002).
>
> 2009 W L 465645, at \*2.

**III. DISCUSSION**

Having reviewed *de novo* those portions of the Report–Recommendation that Plaintiff has lodged objections to, the Court determines to adopt the recommendations for the reasons stated in Magistrate Judge Lowe's thorough report.

**IV. CONCLUSION**

Therefore, the Court **ADOPTS** the recommendations made by Magistrate Judge Lowe in their entirety. Accordingly, it is hereby **ORDERED** that Defendants' motion for summary judgment (Dkt. No. 51) is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)

(Cite as: 2011 WL 4055414 (N.D.N.Y.))


**GRANTED** and the remaining claims in this action are **DISMISSED.** The Clerk is instructed to enter judgment and close the file in this matter.

    **IT IS SO ORDERED.**

N.D.N.Y.,2011.

Parks v. Smith
Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.

GREENWALDT, Plaintiff,
v.
COUGHLIN, et al., Defendants.
**93 Civ. 6551 (LAP).**

April 19, 1995.

*MEMORANDUM AND ORDER*

PRESKA, District Judge:

**\*1** Plaintiff Paul P. Greenwaldt ("Greenwaldt") brings this prisoner pro se suit under 42 U.S.C. § 1983, claiming that the defendants, employees of the New York State Department of Correctional Services ("NYSDOCS"), violated his constitutional rights. Defendants Thomas A. Coughlin, III ("Coughlin"), Commissioner of NYSDOCS; Anthony J. Annucci ("Annucci"), Deputy Commissioner and Counsel; Susan E. Butler ("Butler"), Deputy Commissioner; Philip Coombe, Jr. ("Coombe"), First Deputy Commissioner; James Recore ("Recore"), Director of the Bureau of Temporary Release and Robert Hanslmaier ("Hanslmaier"), Acting Superintendent of Woodbourne Correctional Facility ("Woodbourne"), have moved to dismiss. Defendant T. J. Miller ("Miller"), Deputy Superintendent of Woodbourne, has not joined in the motion to dismiss. For the reasons given below, the motion is granted.

*BACKGROUND*

Greenwaldt makes numerous allegations against the defendants. On May 21, 1993, Greenwaldt was transferred to Woodbourne, a medium security facility under the jurisdiction of NYSDOCS. (Am. Compl. ¶¶ 1-2.)[FN1] Upon his arrival at Woodbourne, a sergeant allegedly informed Greenwaldt that at Woodbourne visits were permitted only on alternate Saturdays and Sundays, depending on the first letter of the inmate's last name.[FN2] Greenwaldt asked if there were any exceptions possible, and the sergeant told him to write the Deputy Superintendent to request an exception. (Am. Compl. ¶¶ 3-6.) Greenwaldt, an avid letter writer, proceeded to write to various state public officials concerning what he perceived to be discriminatory visitation rules. (Am. Com pl. ¶¶ 8-11.)

Greenwaldt also complains that on June 3, 1993, he was placed in keeplock without a good reason. (Am. Compl. ¶¶ 15-16.) Greenwaldt claims that, at about that time, he was fined five dollars, without explanation or notice. (Am. Compl. ¶ 20.) On June 5, 1993, Greenwaldt claims to have received notice that he had been found guilty of "refusing a direct order...; interfering with an officer; and, [sic] creating a disturbance." (Am. Compl. ¶ 22.) Greenwaldt then wrote to defendants Coughlin, Coombe, Annucci, and Hanslmaier complaining of perceived procedural violations in connection with his disciplinary proceeding. (Am. Compl. ¶¶ 23-25.) On June 8, 1993, Greenwaldt attended a Tier II disciplinary hearing and was found "not guilty of one charge, and guilty of the other charges." (Am. Compl. ¶¶ 26-28.) Greenwaldt appealed this finding. (Am. Compl. ¶ 30.) He also persisted in his complaints regarding the five dollar fine. (Am. Compl. ¶ 33.)

Greenwaldt also claims that a Sargeant Keesler ("Keesler") threatened him. Greenwaldt alleges Keesler told him, "if you continue to complain, I will personally have my officers write you up for every little thing and it will cost you much more than the five dollars ($5.00) we already got." (Am. Compl. ¶ 34.) Greenwaldt claims he immediately wrote to Coughlin, Coombe and Hanslmaier informing them of Keesler's threats. Hanslmaier responded to Greenwaldt in a letter which, according to Greenwaldt "totally disregarded the written complaint." (Am. Compl. ¶ 36.)

**\*2** Greenwaldt also claims that Recore denied his appeal

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

of the disciplinary hearing judgment. (Am. Compl. ¶¶ 37-41.) Displeased, Greenwaldt wrote to Recore, complaining that he did not receive a copy of the decision and alleging the decision was inaccurate. (Am. Compl. ¶ 42.) Greenwaldt also complained to Recore of alleged violations of New York correctional facility regulations and of allegedly improper administration of the temporary release program. (Am. Com pl. ¶ 44-48.) In fact, Greenwaldt claims Coughlin, Coombe, Butler, Annucci, Recore, and possibly even then-Governor Mario Cuomo, the Attorney General, and members of the New York State Senate and Assembly were together "engaged in an active conspiracy to circumvent and violate the very laws that they swore to uphold" with respect to the administration of the temporary release program. (Am. Compl. ¶ 49.) Greenwaldt also claims he requested Recore to:

take the necessary steps as the DIRECTOR of the TEMPORARY RELEASE PROGRAMS, to rectify the egregious violations of the law and, [sic] the total disregard of the mandates of 7 N.Y.C.C.R. Part 1900 et seq. by the Temporary Release Committees in the various correctional facilities.

(Compl. ¶ 49.)

Greenwaldt alleges that on September 10, 1993, Keesler conducted a search of Greenwaldt's cell and told him that he was "in real trouble because [he] wrote legal papers for other inmates." (Am. Compl. ¶ 52.) Keesler allegedly took legal papers and forms from Greenwaldt's cell. (Am. Compl. at ¶¶ 53-54.) Greenwaldt was served with a Notice of Charges, taken to a Tier III Disciplinary Hearing and "found guilty and sentenced." Though his legal papers were eventually returned to him, he was fined another five dollars. (Am. Compl. ¶¶ 59, 61.)

Greenwaldt alleges that he was subjected to new threats after this incident. According to Greenwaldt, Keesler and Miller "attempted to intimidate [[[Greenwaldt] by questioning [him] about the lawsuit presently pending." (Am. Compl. ¶ 62.) Greenwaldt claims that Keesler then said of Greenwaldt to Miller, in Greenwaldt's presence, "this one... you can lock up anytime, he deserves it." (Am. Compl. ¶ 62-63.)

Turning to the procedural background of the instant action, Greenwaldt filed his original complaint on September 16, 1993. Defendants Coughlin, Annucci, Butler and Coombe moved to dismiss on November 18, 1993. On December 13, 1993, Greenwaldt filed his memorandum in opposition. Defendants, including Recore, filed an amended memorandum on January 31, 1994. Greenwaldt filed an amended complaint on March 2, 1994. Defendants filed a second amended memorandum on July 15, 1994, Hanslmaier by then having joined the motion as well.

Greenwaldt brings this suit under 42 U.S.C. § 1983, and alleges violations of his rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments. (Am. Compl. ¶¶ 70-74.) He asks that I enjoin the defendants "from further penalizing [Greenwaldt] for exercising his constitutional rights and from confining him to his cell," (Am. Compl. at 22, ¶ 1), and from implementing what Greenwaldt claims is a discriminatory policy on visiting times. (Am. Compl. at 22, ¶ 2). Greenwaldt also seeks declaratory relief declaring unconstitutional the administration of the temporary release program. Finally, he seeks compensatory damages, punitive damages, and costs. Defendants argue, *inter alia,* that there is no basis for holding defendants liable for the alleged violations, and that Greenwaldt has no protected interest, in either the temporary release program or the visitation policy, upon which to base his claims. Defendants' motion to dismiss is granted for the reasons stated below.

*DISCUSSION*

**\*3** Defendants have moved to dismiss the claims pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. A complaint should not be dismissed unless "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim[s] which would entitle him to relief.'" *Elliott v. Bronson,* 872 F.2d 20, 22 (2d Cir. 1989) (quoting *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972)); *Massop v. Coughlin,* 770 F.2d 299, 301 (2d Cir. 1985). In addition, the courts "must construe pro se complaints liberally, applying less stringent standards than when a plaintiff is represented by counsel." *Elliott,* 872 F.2d at 21; *Gill v. Mooney,* 824 F.2d 192, 195 (2d Cir. 1987); *Williams v. Vincent,* 508 F.2d 541, 543 (2d Cir. 1974). Where a plaintiff acts pro se, a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

court must "read his supporting papers liberally, and... interpret them to raise the strongest arguments that they suggest." *Soto v. Walker,* 44 F.3d 169, 173 (S.D.N.Y. 1995). However, I also note that the Court of Appeals has stated that:

As we have repeatedly held, complaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning.

*Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). *See, e.g., Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir. 1988); *Ruderman v. Police Dep't of New York,* 857 F. Supp. 326, 330 (S.D.N.Y. 1994); *Saunders v. Coughlin,* No. 92 Civ. 4289 (SCH), 1994 WL 88108 at *3 (S.D.N.Y. Mar. 15, 1994).

I. Plaintiff's Failure to Allege that the Defendants *Are Personally Responsible for any Violations*

Greenwaldt has failed to allege how the defendants are personally responsible for the injustices he perceives. It is well-settled that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991)); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied,* 434 U.S. 1087 (1978). A plaintiff must "allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir. 1986). The doctrine of *respondeat superior* is not applicable to § 1983 actions brought against corrections officers. *Monell v. Department of Social Serv. of New York,* 436 U.S. 658, 692 (1978); *Bass,* 790 F.2d at 263; *Candelaria v. Coughlin,* No. 93 Civ. 3212 (RWS), 1994 WL 119146 at *4 (S.D.N.Y. Apr. 4, 1994). Similarly, the fact that a defendant may have been in a "high position of authority is an insufficient basis for the imposition of personal liability" under § 1983. *McKinnon,* 568 F.2d at 934; *see also Wright,* 21 F.3d at 501. There are a number of ways in which a defendant in a supervisory position may be found personally involved in, and therefore liable for, constitutional violations, including: (1) direct

participation, (2) failure to remedy a wrong after learning of it, (3) creation or tolerance of a policy under which unconstitutional practices occurred or were allowed to continue, or (4) gross negligence in managing subordinates who committed the violations. *Wright,* 21 F.3d at 501 (citations omitted).

**\*4** Greenwaldt's complaint and memorandum of law ("Pl.'s Mem." or "Memorandum in Opposition") are difficult to follow. He sets forth the facts at length, but mentions his various legal theories only briefly and without connecting those theories to his factual allegations. Thus, it is difficult to assess the merits of his case. However, construing the complaint liberally as I am constrained to do, I take it that Greenwaldt is displeased with various problems he claims to have faced at Woodbourne, including a misbehavior report, a disbursement and surcharge removed from Greenwaldt's account, and threats by a correctional officer to write up Greenwaldt. Greenwaldt also claims that the defendants failed to respond to his numerous letters. The defendants argue they cannot be said to have been personally involved in these alleged constitutional violations and, therefore, cannot be held liable.

In examining the complaint, it is apparent that the only connection between the defendants moving herein and the facts Greenwaldt recites are the numerous letters Greenwaldt claims to have sent the defendants. However, the defendants cannot be held liable on this basis. It is true that "supervisory liability may be imposed where an official demonstrates 'gross negligence' or 'deliberate indifference' to the constitutional rights of inmates by failing to act on information indicating that unconstitutional practices are taking place." *Wright,* 21 F.3d at 501. However, it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations. *E.g., id.; Murray v. Coughlin,* No. 91-CV-0476E(H), 1995 WL 128968 at *6 (W.D.N.Y. Mar. 15, 1995); *Cepeda v. Coughlin,* No. 91 Civ. 2469 (RWS), 1995 WL 23566 at *3 (S.D.N.Y. Jan. 19, 1995); *Clark v. Coughlin,* No. 92 Civ. 0920 (RWS), 1993 WL 205111 at *6 n.2 (S.D.N.Y. June 10, 1993), *aff'd,* 17 F.3d 391 (2d Cir. 1993); *Garrido v. Coughlin,* 716 F. Supp. 98, 100 (S.D.N.Y. 1989) (dismissing that portion of complaint against NYSDOCS Commissioner where his only alleged connection to the case was that "he ignored [plaintiff's]

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

letter of protest and request for an investigation of the allegations made in [the] action"). To the extent that Greenwaldt relies upon his allegations that he sent letters to the defendants, his complaint must be dismissed.

In his Memorandum in Opposition, Greenwaldt contends that he does not rely solely on his letter-writing campaign to allege the personal involvement of the prison officials. Instead, he claims that he joined these defendants because (i) Coughlin directed an investigation by Keesler into Greenwaldt; (ii) the defendants implemented various policies that are not to Greenwaldt's liking; and (iii) Annucci failed to maintain the law library.[FN3] The second of these assertions is addressed *infra.* The first and third claims are too vague to withstand defendants' motion to dismiss. Greenwaldt has not made any "specific allegations of fact." *Barr v. Abrams,* 810 F.2d 358, 364 (2d Cir. 1987). In particular, I note that Greenwaldt has not explained how Annucci's alleged failure to maintain the law library has anything to do with the other defendants. Nonetheless, if Greenwaldt elects to do so, he may attempt to replead these allegations within thirty days of the date of this Memorandum and Order.[FN4]

## II. *The Temporary Release Program*

### A. *Conspiracy Claims*

**\*5** As stated *supra,* Greenwaldt claims that the defendants and numerous political figures, possibly including former Governor Cuomo, the Attorney General, and members of the New York State Senate and Assembly, were engaged in a conspiracy with respect to the temporary release program. (Am. Compl. ¶ 49.) In order to state a claim under § 1983 for conspiracy:

[T]he complaint must contain more than mere conclusory allegations. And while a plaintiff should not plead mere evidence, he should make an effort to provide some "details of time and place and the alleged effect of the conspiracy." Thus, complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; "[d]iffuse and expansive allegations are insufficient, unless amplified by

specific instances of misconduct."

*Dwares v. City of New York,* 985 F.2d 94, 99-100 (2d Cir. 1993) (citations omitted). *See also Leon v. Murphy,* 988 F.2d 303, 311 (2d Cir. 1993); *Polur v. Raffe,* 912 F.2d 52, 56 (2d Cir. 1990) (dismissing plaintiff's claims that defendants conspired to deprive plaintiff of his constitutional rights where plaintiff made only "conclusory allegations" and "diffuse averments" without stating a factual basis for his claim or pleading overt acts indicating the existence of a conspiracy), *cert. denied,* 449 U.S. 937 (1991); *Zemsky v. City of New York,* 821 F.2d 148, 151 (2d Cir.), *cert. denied,* 484 U.S. 965 (1987). In the instant case, Greenwaldt's claim of conspiracy is insufficient to survive a motion to dismiss. It is entirely conclusory; Greenwaldt has failed to plead any factual basis indicating the existence of a conspiracy. Greenwaldt will not, however, be permitted to replead his conspiracy claim because, as explained *infra,* he has no protectible interest in the temporary release program.

### B. *No Protected Interest*

Greenwaldt may not replead his conspiracy claim because he does not have a federally protected right to participate in New York's temporary release program. In order to state a claim under the due process clause, Greenwaldt must first allege that he was deprived of a property or liberty interest. Only if he claims such a protected interest is it necessary to go on to determine whether the deprivation of that interest occurred without the process that was due under the circumstances. *See generally Goss v. Lopez,* 419 U.S. 565 (1975); *Board of Regents v. Roth,* 408 U.S. 564 (1972); *White Plains Towing Corp. v. Patterson,* 991 F.2d 1049, 1061-62 (2d Cir.) (stating that "[i]n order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest"), *cert. denied,* 114 S. Ct. 185 (1993). In the instant case, Greenwaldt's claim fails because there is no protected right to participate in New York's temporary release program.

**\*6** It is well-settled that the Constitution itself does not confer a right for an inmate to be conditionally released before serving his full sentence. *Connecticut Bd. of*

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

*Pardons v. Dumschat,* 452 U.S. 458, 464 (1981); *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7 (1979)* (stating that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence"). The question thus becomes whether New York conferred an enforceable liberty interest in its temporary release program.

In general, a state may create a protected liberty interest through the use of mandatory language and placement of substantive limits on the authority and discretion of state officials. *See Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 461-63 (1989); *Olim v. Wakinekona,* 461 U.S. 238, 249-51 (1983); *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). In order for the state to confer such a liberty interest:

(1) the state must have articulated specified "substantive predicates" which limit the discretion of state officials; and (2) it must have employed "explicitly mandatory language," requiring state officials to follow those substantive predicates.

*Klos,* 1995 WL 64776 at *6.

Turning to New York's temporary release program, it is clear that prisoners do not have a protected interest in being admitted to this program. Neither the governing statute, Correction Law § 851 *et seq.,* nor the regulations, 7 N.Y.C.R.R. § 1900 *et seq.,* contain any assurance of admission into the program. In fact, it is stated explicitly that there are no guarantees of admission:

Participation in the temporary release program shall be a privilege. Nothing contained in this article may be construed to confer upon any inmate the right to participate, or to continue to participate, in a temporary release program.

Correction Law § 855(9). Nothing in the regulations concerning the temporary release program confers a protected entitlement. *See* 7 N.Y.C.R.R. § 1900 *et seq.* In addition, courts that have considered whether inmates in New York have a protected interest in the temporary release program have consistently held that they do not. *See, e.g., Dugar v. Coughlin,* 613 F. Supp. 849, 854-57 (S.D.N.Y. 1985); *Martino v. Gard,* 526 F. Supp. 958, 960 (E.D.N.Y. 1981); *McCormack v. Posillico,* No. 71654, 1995 WL 122170 at *1 (3d Dep't Mar. 23, 1995); *Grant v. Temporary Release Committee,* 619 N.Y.S.2d 106, 106 (2d Dep't 1994); *Szucs v. Recore,* 618 N.Y.S.2d 473, 473 (3d Dep't 1994); *Walker v. Le Fevre,* 598 N.Y.S.2d 345, 345 (3d Dep't 1993). Consequently, Greenwaldt's claim that he was denied due process in connection with the temporary release program is dismissed without leave to replead.

III. *Visitation Policy*

Greenwaldt is disgruntled with the NYSDOCS visitation policy. (Am. Compl. ¶ ¶ 4-6, 8-10.) It appears that Greenwaldt is most displeased about the fact that visits are permitted daily at maximum security facilities but only on weekends and holidays at medium and minimum security facilities. The Supreme Court unambiguously has rejected the argument that "an inmate's interest in unfettered visitation is guaranteed directly by the Due Process Clause." *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460 (1989). The question thus becomes whether New York has created a protected interest in visitation. *Klos v. Haskell,* No. 684, 93-2666, 1995 WL 64776 at *6 (2d Cir. Feb. 10, 1995). It appears that New York has done so. *See Kozlowksi v. Coughlin,* 871 F.2d 241, 242 (2d Cir. 1989) (explaining that the District Court had ruled that a "state-created liberty interest in prison visitation rights existed, and that proper process was due prior to curtailment of these rights"); *Ricco v. Coughlin,* No. 92-CV-0632E(H), 1995 WL 128959 at *1 (W.D.N.Y. Mar. 15, 1995); *Daniels v. Walker,* No. 93-CV-570, 1995 WL 88186 at *5 (N.D.N.Y. Mar. 1, 1995).

*7 However, to recognize that inmates have a protected interest in visitation is not to say that the NYSDOCS policy infringe upon that interest. The District Court has considered and rejected a virtually identical claim to Greenwaldt's in an earlier decision, *Windley v. Cuomo,* No. 91 Civ. 3774 (TPG), 1992 WL 123172 at *2 (S.D.N.Y. May 27, 1992). In that case, a prisoner at a New York state facility complained that the facility's elimination of weekday visitation violated his rights under

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the First Amendment, the Eighth Amendment, and the Due Process Clause of the Fourteenth Amendment. *Id.* at *1. Visitation was, however, permitted on weekends and state holidays. *Id.* The District Court dismissed plaintiff's due process claim, explaining that:

Plaintiff's Fourteenth Amendment claim is also without substance. It is true that "[t]he State of New York, by judicial decision, administrative regulation and departmental directive, has granted its prisoners a protected liberty interest in receiving visits from persons of their choice." *Kozlowski v. Coughlin,* 539 F. Supp. 852, 856-57 (S.D.N.Y. 1982). Neither the *Kozlowski* decision nor any provision of state or federal law, however, forbids reasonable regulation of visiting hours by prison officials. There is no showing that the regulation here exceeds the bounds of reasonableness.

*Id.* This reasoning is equally applicable to the instant case, where the policy is the same, *i.e.,* visitation is permitted on the weekends and holidays. Thus, Greenwaldt's claims regarding visitation policy are dismissed with prejudice.

IV. *Equal Protection Claims*

Greenwaldt argues in his Memorandum in Opposition that his complaint should not be dismissed because, he claims, the defendants have violated the Equal Protection Clause of the Fourteenth Amendment with respect to visitation policy and the temporary release program. (Pl.'s Mem. at 7). Greenwaldt claims in his Memorandum in Opposition that:

Plaintiff can *decisively* demonstrate, if permitted to proceed with discovery, that discrimination exists under the rules, regulations, practices and policies of the defendants in relation to visits, temporary release, disciplinary programs, etc.

(Pl.'s Mem. at 7-8 (emphasis in original).)

Greenwaldt's claims that he will be able to establish discrimination by the defendants if he is permitted to engage in discovery does not preclude dismissal of his equal protection claims at this time. Greenwaldt's equal protection claims are properly dismissed at this time because they are vague and inconclusive. *See Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987). If Greenwaldt seeks to do so, he may replead his equal protection claims within thirty days.

*CONCLUSION*

With respect to the defendants moving herein, *i.e.,* Coughlin, Annucci, Butler, Coombe, Recore, and Hanslmaier, Greenwaldt's complaint is dismissed with prejudice in its entirety, with the limited exception of those particular claims that Greenwaldt has been granted leave to replead within thirty days. That is, within thirty days of the date of this Memorandum and Order, Greenwaldt may replead his allegations that Coughlin directed an investigation by Keesler into Greenwaldt, that Annucci failed to maintain the law library, and that the defendants violated his right to equal protection with respect to visitation policy and the temporary release program.

FN1. Reference is made to the Amended Complaint dated February 25, 1994.

FN2. Inmates whose names begin with letters A-L would have visitations on Saturday, and those whose names begin with letters M-Z on Sunday. On the following weekend, the order would be reversed. (Am. Compl. ¶4.)

FN3. As Greenwaldt puts it in his memorandum:

In the present case, COMMISSIONER COUGHLIN not only learned of the deprivations through letters from the plaintiff; but went so far as to direct an investigation by the defendant KEESLER. Exactly what more plaintiff must do to show that the Commissioner has direct knowledge and is condoning his subordinates [sic] actions or lack of actions, as the case may be, is beyond

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)
(Cite as: 1995 WL 232736 (S.D.N.Y.))

the comprehension of the plaintiff.... Plaintiff does not join the Commissioner of Correctional Services and three Deputy Commissioners by virtue of their failure to respond to plaintiff's complaints in letters addressed to them respectively. He (plaintiff) joins the Commissioner and the three Deputy Commissioners by virtue of the investigation ordered by COMMISSIONER COUGHLIN and the implementation of various policy Directives signed and ordered by the Deputy Commissioners and condoned by the Commissioner.... Counsel either fails to understand the responsibilities of either the Commissioner or the three Deputy Commissioners or, while understanding their respective responsibilities would rather distort the factual position of the plaintiff. The perfect example of the above is Deputy Commissioner Annucci's total disregard of his responsibility to maintain the law libraries with the proper materials.

(Pl.'s Mem. at 3-4.) I note that Greenwaldt's allegations regarding the investigation and the law library are glaringly absent from the complaint.

FN4. I note that it may be that, if pleaded properly, Greenwaldt's claim that Annucci failed to maintain the law library might state a claim. For example, it has been held that:

Prisoners have a constitutional right of access of the courts. Thus prison authorities must assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law. The right of access to the courts must ensure that prisoners have a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts. Courts have held that prisoners do not have a right to access law books per se, but must be provided with any of several methods designed to provide meaningful access to the courts

including the use of trained legal assistants.

*Bellamy v. McMickens,* 692 F. Supp. 205, 214 (S.D.N.Y. 1988). *See Morello v. James,* 810 F.2d 344, 347 (2d Cir. 1987) (stating that "[w]here a prisoner chooses to proceed pro se with his appeal, the state is required to provide affirmative assistance in the form of adequate law libraries or trained legal assistance"). However, Greenwaldt's allegations are, again, too conclusory to assess, and must be dismissed.

S.D.N.Y. 1995

Greenwaldt v. Coughlin

Not Reported in F.Supp., 1995 WL 232736 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff
and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Terry CICIO, Plaintiff,
v.
GRAHAM; Peter M. Sigona; Richard D. Ruston, III;
Phil J. Manna; A. Vega; and Ryerson, Defendants.
No. 9:08-CV-534 (NAM/DEP).

March 15, 2010.
Terry Cicio, Malone, NY, pro se.

Hon. Andrew M. Cuomo, Office of the Attorney General,
State of New York, Adrienne J. Kerwin, Esq., of Counsel,
Albany, NY, for Defendants.

**MEMORANDUM-DECISION AND ORDER**

HON. NORMAN A. MORDUE, Chief Judge.

*1 Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
brought this action for declaratory and monetary relief
under 42 U.S.C. § 1983, claiming excessive use of force,
failure to intervene, and denial of adequate medical care
stemming from a disturbance involving 17 or more
inmates occurring in a "holding pen" or "cage" at Auburn
Correctional Facility ("ACF") on March 7, 2006. Plaintiff
moved for summary judgment (Dkt. No. 35) and
defendants cross-moved for summary judgment (Dkt. No.
38). Upon referral of the motions pursuant to 28 U.S.C. §
636(b)(1)(B) and Local Rule 72.3(c), United States
Magistrate Judge David E. Peebles issued a Report and
Recommendation (Dkt. No. 41) recommending that this
Court deny plaintiff's motion, grant defendants' motion,
and dismiss the action.

Plaintiff has submitted an objection (Dkt. No. 42).
Plaintiff states that the Court should have reviewed the

transcripts from his disciplinary hearing, because the
testimony of defendants Peter M. Sigona and Richard D.
Ruston, III at that hearing "contradicts the reports that
[Magistrate Judge Peebles] relied on in making [his]
decision." Plaintiff gives no specifics and thus appears to
be interposing a general objection directed to the issues of
excessive force and failure to intervene. His objection
does not refer to the issue of medical indifference.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court
reviews *de novo* those parts of a report and
recommendation to which a party specifically objects.
Where, as here, a party interposes only general objections
to a report and recommendation, the Court reviews for
clear error or manifest injustice. *See Davis v. Chapple,*
2010 WL 145298, *2 (N.D.N.Y. Jan.8, 2010), *Brown v.
Peters,* 1997 WL 599355,*2-* 3 (N.D.N.Y.), *aff'd without
op., 175 F.3d 1007 (2d Cir.1999).* Failure to object to any
portion of a report and recommendation waives further
judicial review of the matters therein. *See Roldan v.
Racette, 984 F.2d 85, 89 (2d Cir.1993).*

The Court accepts and adopts Magistrate Judge
Peebles' Report and Recommendation. In view of
plaintiff's objection, which, as noted, appears to be
directed to the evidence on the issues of excessive force
and failure to intervene, the Court briefly revisits these
issues. Although plaintiff interposes only a general
objection on these issues, in light of his *pro se* status and
the nature of the objection, the Court conducts a *de novo*
review. Plaintiff requests the Court to obtain the transcript
of the disciplinary hearing and contends that the testimony
given by Sigona and Ruston at that hearing contradicts the
reports relied on by Magistrate Judge Peebles; however,
as explained below, the award of summary judgment to
defendants is based on plaintiff's own evidence.

The record evidence pertinent to the excessive force
and failure to intervene claims is briefly summarized as
follows. In a declaration supporting the motion for
summary judgment, Sigona, a sergeant at ACF, states:

*2 On March 7, 2006, I was supervising the hospital

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

depot area at Auburn. While waiting with a group of inmates in the holding pen in the hospital depot, inmate Baer became disruptive and began threatening staff. Baer ignored several orders by me to cease his behavior. I then entered the holding pen with Officers Manna and Ruston with the intention of removing inmate Baer.

All of the inmates in the pen were ordered to one side of the pen, while Baer remained on the other. Inmate Green refused to move, so I guided him to the side directed.

While I was guiding inmate Green, plaintiff Cicio then lunged at Officer Manna, striking him with a closed fist and knocking him to the ground. I immediately went to Officer Manna's aid and assisted with gaining control of Cicio by taking control of Cicio's right side. Officer Manna and I then escorted a struggling Cicio out of the pen, after which Cicio and Officer Manna fell to the floor. Once Cicio stopped struggling, he was removed from the area and taken to medical for examination.

The declaration from defendant Philip J. Manna, a corrections officer at ACF, is consistent with Sigona's declaration.

Plaintiff's complaint states that defendant Sigona pushed plaintiff into defendant Manna "who then grabbed plaintiff by the hair and began to pull plaintiff towards [the] holding pen door at which point plaintiff was thrown to the floor and kneed in [the] nose." The complaint further states that, after plaintiff was brought to his feet and escorted out of the immediate area, defendant Manna "once again grabbed plaintiff by his hair and pushed plaintiff's face into [the] wall." According to plaintiff, Sigona and Ruston "stood and watched the incident" and did not "intervene[ ] to stop the assault."

Plaintiff testified in his deposition that there were 17 or 18 inmates in the holding pen awaiting transport; that there were no corrections officers in the pen but there were some in the vicinity; that another inmate George Baer started "cursing up a storm" at a corrections officer; and that the sergeant told Baer to "cut it out," to which Baer responded, "No." The sergeant then said, "Take him out of there," ordered Baer to come up front, and ordered

everyone else to the back of the pen. Instead of coming up front, Baer "sat down in the middle of the cage." Plaintiff stated that everyone else went to the back of the pen except plaintiff and inmate Green; according to plaintiff, they could not go back because "there was no more room." As plaintiff describes it:

There wasn't any more room. And he [Green] was standing directly in front of Inmate Baer. So they started taking Green out of the holding pen, and that's where everything just a whole jumble of things happened. I ended up getting mixed up in that, because one of officers tried to barge in there and push me into the sergeant, and then I got into a use of force behind it. So a whole lot of events that took place after one move.

**\*3 \* \* \***

Once they started pulling [Green] out [of the pen], other officers barged into the cage. I don't know if done purposely or not, but I was pushed into the sergeant, and from there I was given an assault charge and taken down.

\* \* \*

... [Baer] was sitting there [in the middle of the pen] when Green was being taken out. After I was pushed to the sergeant, I don't know what happened.

Plaintiff's deposition testimony continued:

Q. Was Green eventually taken out?
A. Yes.

Q. Okay. Now, was he still in the cage when you got pushed into the sergeant?

A. I am not sure.

Q. It was all happening at the same time?

A. Yes.

Q. Did you see any officers go to Baer to get him up and out?

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

A. Not specifically, because by this time it was just chaos in the cage. I was on the floor somewhere. I don't know where.

Q. How many officers were taking out Green?

A. When I first seen, I only saw one before everything just-

Q. When the sergeant said, "Take him of there," meaning Baer, how many officers entered the pen?

A. At the time, there was about five or six.

Q. They entered at the time just to remove Baer because of the goings on?

A. Yes.

Q. Was one of them the sergeant?

A. Yes. There was a sergeant in there.

Q. So the sergeant and/or three or four officers?

A. Quite a few, yes. Something like that.

Q. Okay. So they enter. Then Green is told to move. He doesn't. Somebody, was it one of those officers that entered that tried to remove Green?

A. The first officer that enters, the one that ... talked to him at first trying to remove him. I don't know which officer that was.

Q. Okay. But no additional officers to deal with Green, it was somebody in there from Baer?

A. Right. Once Green, once they saw an officer pulling Green out of the cage, that's when more officers entered the cage.

Q. So I think, and when I try to recap what you just said, I am not trying to put words in your mouth, but tell me if I am doing it wrong. I am trying to make sure I get it right. You said five or six officers came in to deal with Baer; is that right?

A. Something close to, right.

Q. How many more entered once Green became an issue?

A. I have no idea, because by that time I was into the sergeant and on the floor.

Q. Okay. All right. So somebody, as they are rushing in, whether intentional or not, you don't know, pushed you into the sergeant?

A. Right.

Q. Then what happened?

A. From there, I was taken down. I got kneed in the nose.

Q. Do you know who took you to the floor?

A. I am only going by the reports.

Q. Okay.

A. I don't know specifically. Only in the reports that they wrote do I know any names.

Q. Okay.

A. But other than that, at the time of the incident, I didn't know anything.

Q. Okay. At what point in time did you-at some point in time did you see the report?

**\*4** A. I saw the reports after I got my misbehavior report, and I got my assistance, and I asked for the use of force report, and the unusual incident report, and everything else.

Q. Okay. Now, once you were taken to the floor, then what happened? Take me through it totally.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

A, Once I was taken to the floor, another CO kneed me in the nose. I don't know who.

Q. You don't think it was the same person that took you to the floor? A. I doubt it.

Q. All right. Okay.

A. And once I was lifted, I was pulled [from] the cage by my hair. At the time I had a lot of hair. I was pulled out [of] the cage by my hair, and then I hit the floor again.

Q. Okay. Now when you hit the floor again, were you taken to the floor? Do you know how that happened, the second hitting of the floor?

A. I am not sure.

Q. Okay.

A. I am not sure.

Q. You ended up on the floor?

A. I just ended up on the floor with a couple C.O.s on top of me. I don't know if they fell, if I fell. I have no idea.

Q. There were other officers on the floor with you?

A. Right.

Plaintiff explained that he was then removed from the scene, taken upstairs to "their SHU" and given a ticket. He was placed in a different holding pen where a nurse came to see him within 15 or 20 minutes. According to plaintiff, he told the nurse that his nose hurt, he had pains in his right wrist, which was swollen, and some of his hair "had got pulled out in back." He was not bleeding. He requested and was denied pain medication, although at some later time he was given ibuprofen. He had headaches "off and on" for two or three weeks and his wrist was swollen for a few days, although it did not limit any of his activities.

When the disputed facts are viewed most favorably to plaintiff and considered in combination with the undisputed facts, the record shows the following: a group of 17 or 18 inmates was confined in the pen; one inmate, Baer, became disruptive and refused to comply with Sergeant Sigona's direction to stop; five or six corrections officers entered the pen to remove Baer; the other inmates were directed to move to the back of the pen; there was not room for Green and plaintiff to do so; Green was told to move but did not do so; and corrections officers began removing Green. The evidence further shows that at that point "just a whole jumble of things happened"; more corrections officers entered the pen; as they were entering, one of them-intentionally or not-pushed plaintiff into Sergeant Sigona; it was "chaos" in the pen; a corrections officer took plaintiff to the floor; and plaintiff then "got kneed in the nose," probably by a different corrections officer. Plaintiff was then pulled out of the pen. In his complaint he states that Officer Manna again grabbed him by the hair and pushed his face into the wall, whereas in his deposition, plaintiff stated that he was pulled out of the pen by his hair and "ended up on the floor again" with a couple of corrections officers on top of him, and added: "I don't know if they fell, if I fell." He was then removed and taken to SHU, where a nurse examined him within 20 minutes.

**\*5** The Court agrees with Magistrate Judge Peebles that defendants are entitled to summary judgment dismissing plaintiff's claims of excessive force. It is undisputed that the force used on plaintiff on March 7, 2006 occurred in the context of a disturbance involving 17 or 18 inmates in a holding pen. In plaintiff's own word, it was "chaos." Indeed, plaintiff states that when he was pushed into Sergeant Sindona it may have been unintentional, and that, when he went to the floor a second time, it may have been because he and/or the corrections officers fell. In view of this evidence and the minimal nature of plaintiff's injuries, no rational trier of fact could conclude that plaintiff was subjected to force that was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. See Wright v. Goord, 554 F.3d 255, 268-69 (2d Cir.2009). For the same reason, there is no basis for a claim of failure to intervene. Moreover, no rational trier of fact could find

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

that plaintiff suffered a serious medical need. As to the other issues raised, the Court agrees with the Report and Recommendation. Accordingly, the Court hold that plaintiff has failed to establish that he is entitled to summary judgment; defendants have demonstrated their entitlement to summary judgment; and plaintiff has failed to show the existence of a material question of fact.

In addition to his objection to the Report and Recommendation (Dkt. No. 42), plaintiff has filed what appears to be an appeal from the Report and Recommendation (Dkt. No. 43). Because Magistrate Judge Peebles did not issue any order which could be the subject of the appeal, the appeal is denied. In the event that plaintiff wishes to appeal from this Memorandum-Decision and Order, he should follow the procedure set forth in the Civil Appeals Packet, which will be provided to him with this decision.

It is therefore

ORDERED that United States Magistrate Judge David E. Peebles's Report and Recommendation (Dkt. No. 41) is accepted and adopted; and it is further

ORDERED that the appeal (Dkt. No. 43) from the Report and Recommendation is denied; and it is further

ORDERED that plaintiff's motion for summary judgment (Dkt. No. 35) is denied; and it is further

ORDERED that defendants' cross motion for summary judgment (Dkt. No. 38) is granted and the complaint dismissed on the merits; and it is further

ORDERED that the Clerk is directed to provide plaintiff with a Civil Appeals Packet.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

[DAVID E. PEEBLES](), United States Magistrate Judge.

Plaintiff Terry Cicio, a New York State prison inmate who is proceeding *pro se* and *in forma pauperis,* has commenced this action pursuant to [42 U.S.C. § 1983](),

claiming deprivation of his civil rights. In his complaint plaintiff asserts that he was assaulted by one of the defendants while two others stood by and failed to intervene, and that following the assault medical personnel at the prison facility where the incident took place failed to provide requested medical treatment for his resulting injuries. Plaintiff's complaint seeks both declaratory and monetary relief.

**\*6** Currently pending before the court are cross-motions for summary judgment. Plaintiff initiated the motion process, moving for summary judgment and claiming that the evidence in the record supports a finding in his favor on the issue of liability and that no reasonable factfinder could conclude otherwise. Defendants have responded by both opposing plaintiff's motion and seeking summary judgment dismissing plaintiff's complaint. In their motion defendants assert that based upon the record now before the court no reasonable factfinder could find in plaintiff's favor on any of his claims and that, in any event, they are deserving of qualified immunity from suit under the circumstances presented.

Having carefully reviewed the record considered in light of the arguments of the parties, for the reasons that follow I recommend that defendants' motion be granted and that plaintiff's motion be denied.

## I. *BACKGROUND*

The facts forming the basis for plaintiff's claims are not particularly complex, although the parties have given conflicting accounts of the relevant events, particularly with regard to the circumstances surrounding the use of force by prison officials of force against Cicio.

Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"); at the times relevant to his complaint, Cicio was housed at the Auburn Correctional Facility ("Auburn"), located in Auburn, New York. *See generally* Complaint (Dkt. No. 1). On March 7, 2006, while plaintiff was among a group of between sixteen and eighteen inmates confined in the Auburn hospital depot awaiting transfer out a disruption occurred involving a fellow prisoner. Complaint (Dkt. No. 1) Statement of Facts ¶ 1; Sigona Decl. (Dkt. No. 38-8) ¶ 3; Manna Decl. (Dkt. No. 38-9) ¶ 3; *see also* Kerwin Aff.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

(Dkt. No. 38-3) Exh. K (transcript of plaintiff's deposition, conducted on May 15, 2009 and hereinafter cited as "Plaintiff's Dep. Tr." at pp. 8-10). Defendants Sigona, Manna and Ruston, all three of whom are employed as corrections workers at the facility, responded to the incident, entering the cell and ordering all of the inmates to retreat to the back. Complaint (Dkt. No. 1) Statement of Facts ¶ 2, Manna Decl. (Dkt. No. 38-9) ¶ 3; Sigona Decl. (Dkt. No. 38-8) ¶ 3. While those corrections officers attempted to remove the dissident inmate from the cell plaintiff Cicio became involved. It is at this point that the parties' versions of the relevant events significantly diverge.

Plaintiff contends that during the ensuing events he was pushed into defendant Manna, who then grabbed him by the hair and began to pull him toward the cell door, resulting in Cicio being thrown to the floor and kneed in the nose. Complaint (Dkt. No. 1) Statement of Facts ¶ 4; Cicio Decl. (Dkt. No. 40-2) ¶ 4. Plaintiff maintains that after regaining his footing he was again grabbed by the hair and pushed face first into the wall. Complaint (Dkt. No. 1) Statement of Facts ¶ 5. Plaintiff asserts that while this was occurring defendants Sigona and Ruston stood by and watched without coming to his assistance. *Id.*

*7 Defendants offer a markedly different version of the relevant events. According to the defendants, while they were attempting to extricate the disruptive inmate from the holding cell Manna issued a direct order to the plaintiff to move to the back of the cage. Plaintiff's Exh. D (Dkt. No. 35-2) Disregarding the order, plaintiff blocked Corrections Officer Manna's path, lunged at him and struck him with a closed fist knocking him to the floor. *Id.; see also,* Manna Decl. (Dkt. No. 38-9) ¶ 4; Sigona Decl. (Dkt. No. 38-8) ¶ 5. Cicio then began yelling to the other inmates in the cage, encouraging them to join in, exclaiming, "let's get them." Plaintiff's Exh. D (Dkt. No. 35-2). At that point, defendants Manna and Sigona attempted to subdue Cicio, who continued to struggle and resist, resulting in Cicio and Officer Manna falling to the floor. Manna Decl. (Dkt. No. 38-9) ¶¶ 4-5; Sigona Decl. (Dkt. No. 38-8) ¶ 5.

As a result of the incident a misbehavior report was subsequently issued by Corrections Officer Manna

charging Cicio with disciplinary infractions, including 1) assault on staff; 2) prison takeover; 3) engaging in violent conduct; 4) inciting inmates; 5) disobeying a direct order; 6) physically interfering with an employee; and 7) impeding inmate movement. Mann Decl. (Dkt. No. 38-9) ¶ 7. Following a Tier III disciplinary hearing commenced on March 13, 2006, plaintiff was found guilty of five of the six violations including, *inter alia,* assault on staff. Kerwin Aff. (Dkt. No. 38-3) Exh. I. As a result of that determination plaintiff received a series of sanctions which, after being modified on appeal, included twelve months of confinement in a facility special housing unit ("SHU") with a corresponding loss of packages, commissary, and telephone privileges, and an additional recommendation that plaintiff forfeit twelve months of good time credits. *Id.*

Following the incident plaintiff was immediately removed from the area and taken to be examined by facility medical personnel. Manna Decl. (Dkt. No. 38-9) ¶ 6. Plaintiff was examined by defendant A. Vega, a registered nurse, within fifteen to twenty minutes after the incident. Cicio Decl. (Dkt. No. 40-2) ¶ 5; Plaintiff's Dep. Tr. at p. 22. During that examination Nurse Vega observed a reddened area on the bridge of plaintiff's nose and noted his reports of minor pain in the nose and head areas. Plaintiff's Dep. Tr. at pp. 25-26; *see also* Kerwin Aff. (Dkt. No. 38-3) Exhs. B and H. Plaintiff was not treated for his injuries nor was he scheduled to see a doctor. Complaint (Dkt. No. 1) Statement of Facts ¶ 8.

Plaintiff claims that following the incident he submitted sick call slips on March 8, 9, 13 and 19, 2006, requesting medical intervention to address his injuries. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 9, 11-12 and 15. Plaintiff contends, however, that those sick call slips were not processed by defendant Ryerson, the nurse administrator at Auburn. *Id.* ¶ 22. Defendant Ryerson denies that allegation and counters that based upon her review of all sick call slips received during the time period involved, there is no record of plaintiff having requested sick call at any time between March 8 and March 20, 2006. Ryerson Decl. (Dkt. No. 38-10) ¶ 4.

*8 As is the case with regard to plaintiff's substantive allegations, the parties disagree over the procedural steps

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

taken by the plaintiff to seek internal review of the relevant events. Plaintiff contends that following the incident he filed two separate grievances, filing the first on March 14, 2006, and both related to the failure of prison officials to permit him to attend sick call. Complaint (Dkt. No. 1) Statement of Facts ¶¶ 14, 16. Plaintiff does not assert in his complaint that he filed a grievance regarding the alleged use of force and failure of prison officials to intervene on his behalf, although in an affirmation in opposition to defendants' summary judgment motion Cicio succinctly states "[p]laintiff filed grievances on both incidents, only one was responded to." *See* Cicio Aff. (Dkt. No. 39) ¶ 3. Plaintiff's motion submission also includes a handwritten memorandum, dated March 14, 2006 and addressed to the facility inmate grievance review committee ("IGRC"), citing the events including the alleged assault by prison officials. *See* Plaintiff's Exhs. (Dkt. No. 35-3) p. 24 of 27.

According to the defendants, the sole grievance filed by plaintiff regarding the incident was submitted on March 24, 2006 and was denied by the facility IGRC on April 3, 2006 after plaintiff was transferred out of Auburn. Graham Decl. (Dkt. No. 38-7) ¶ 6. That denial was subsequently affirmed by defendant Graham, the Superintendent at Auburn, on April 3, 2006. While plaintiff claims to have appealed that determination on June 12, 2006, presumably to the DOCS Central Office Review Committee ("CORC"), the record contains no further indication of whether that appeal was in fact taken, and if so, the result. *See* Complaint (Dkt. No. 1) Statement of Facts ¶ 18. According to prison officials at Auburn, their research of relevant records at the facility failed to disclose additional documents regarding plaintiff's exhaustion of remedies and, significantly, to show that plaintiff appealed to Superintendent Graham from the disposition of his claimed use of force grievance. *See* Graham Decl. (Dkt. No. 38-7) ¶ 4.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on April 28, 2008.[FN1] As defendants, plaintiff's complaint names Auburn Superintendent Harold D. Graham; Corrections Sergeant Peter M. Sigona; Corrections Officers Richard D. Ruston and Phil J. Manna; Registered Nurse A. Vega; and Nurse

Administrator Ryerson. The complaint alleges varying claims against those defendants including for the alleged use of excessive force and failure to protect the plaintiff from the use of force as well as indifference to his medical needs arising from the incident.[FN2] *See generally* Complaint (Dkt. No. 1).

> FN1. This action was filed in the Western District of New York but was subsequently transferred here by order issued on May 2, 2008 by Chief District Judge Richard J. Arcara. Dkt. Nos. 1, 3.

> FN2. In his motion submission, plaintiff also claims to have asserted a cause of action for violation of procedural due process, based upon the defendants' alleged failure to process and investigate his grievances. Plaintiff's Memorandum (Dkt. No. 35-3) at p. 2. Such a claim, if indeed present in this action, is nonetheless subject to dismissal, since it is well established that a prison inmate has no cognizable constitutional right of access to the grievance process or to have grievances which have been filed investigated. *Avent v. Doe*, No. 9:05-CV-1311, 2008 WL 877176, at *8 (N.D.N.Y. Mar.31, 2008) (Scullin, S.J. & DiBianco, M.J.) (citing *Torres v. Mazzuca*, 246 F.Supp.2d 334, 342 (S.D.N.Y.2003)).

Issue was initially joined in the action by defendant Manna through his filing of an answer on September 25, 2008. Dkt. No. 23. Following the denial of their pre-answer motion seeking dismissal of plaintiff's claims against them on a variety of bases, *see* Dkt. Nos. 29, 32, an answer was filed on behalf of the remaining defendants on February 25, 2009. Dkt. No. 30.

**\*9** On July 15, 2009, following pretrial discovery, plaintiff filed a motion for summary judgment in his favor. Dkt. No. 35. While plaintiff's motion appears to focus on the defendants' use of force, it purports to seek summary judgment on all of his claims. *See id* . On September 28, 2009, defendants responded in opposition to plaintiff's motion and in support of a cross-motion requesting judgment dismissing all of plaintiff's claims against them as a matter of law. Dkt. No. 38. In their motion,

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

defendants argue that 1) plaintiff's deliberate medical indifference claim is legally deficient based both upon his inability to establish the existence of a serious medical need and the lack of evidence of indifference on the part of defendants Vega or Ryerson, the two medical personnel against whom the claim appears to have been lodged; 2) plaintiff's claim surrounding the alleged use of a excessive force and failure to intervene lacks merit; 3) plaintiff's claims against Superintendent Graham are subject to dismissal based upon his lack of personal involvement in the constitutional deprivations alleged; and 4) in any event defendants are entitled to qualified immunity from suit. Plaintiff has since responded in opposition to defendants' motion and in further support of his initial summary judgment motion. Dkt. Nos. 38, 39, 40.

The parties' cross-motions, which are now fully briefed and ripe for determination, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986); *Security Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82-83 (2d Cir.2004). A fact is "material," for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir.2005) (citing *Anderson).* A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n. 4, 106 S.Ct. at 2511 n. 4; *Security Ins.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material issue of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Though *pro se* plaintiffs are entitled to special latitude when defending against summary judgment motions, they must establish more than mere "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *but see Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 620-21 (2d Cir.1999) (noting obligation of court to consider whether *pro se* plaintiff understood nature of summary judgment process).

**\*10** When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences from the facts in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137-38 (2d Cir.1998). The entry of summary judgment is warranted only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *See Building Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507-08 (2d Cir.2002) (citation omitted); *see also Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511 (summary judgment is appropriate only when "there can be but one reasonable conclusion as to the verdict").

In a case such as this, where parties have interposed cross-motions for summary judgment, each motion must be independently assessed, using this standard as a backdrop. *See Light Sources, Inc. v. Cosmedico Light, Inc.,* 360 F.Supp.2d 432, 434 (D.Conn.2005).

### B. *Excessive Force/ Failure To Intervene*

At the heart of plaintiff's complaint is his claim that

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

on March 7, 2006 he was subjected to an unprovoked attack by defendant Manna and that defendants Sigona and Ruston watched and failed to take any measures to end the assault and that, as a result, he suffered physical injuries. Plaintiff claims that the record supports his excessive force and failure to intervene claims as a matter of law. Defendants counter by arguing that no reasonable factfinder could conclude, based upon the record now before the court, that plaintiff's constitutional rights were violated, even assuming the truth of his version of the relevant events.

1. *Excessive Force*

Plaintiff's excessive force claim must be analyzed under the Eighth Amendment, which proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976); *see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1076, 1084 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement; thus, the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A plaintiff's constitutional right against cruel and unusual punishment is violated by an "unnecessary and wanton infliction of pain." *Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citations and quotations omitted); *Griffen v. Crippen,* 193 F.3d 89, 91 (2d Cir.1999). The lynchpin inquiry in deciding claims of excessive force against prison officials is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian,* 503 U.S. 1, 6-7, 112 S.Ct. 995, 998-999, 117 L.Ed.2d 156 (1992) (applying *Whitley* to all excessive force claims); *Whitley,* 475 U.S. at 320-21, 106 S.Ct. at 1085 (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.) (Friendly, J.), *cert. denied sub nom., John v. Johnson,* 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973)).

**\*11** Analysis of claims of cruel and unusual punishment requires both objective examination of the conduct's effect and a subjective inquiry into the defendant's motive for his or her conduct. *Wright v. Goord,* 554 F.3d 255, 268 (2d Cir.2009) (citing *Hudson,* 503 U.S. at 7-8, 112 S.Ct. at 999 and *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999)). As was recently emphasized by the United States Supreme Court in *Wilkins v. Gaddy,* however, after *Hudson* the "core judicial inquiry" is focused not upon the extent of the injury sustained, but instead whether the nature of the force applied was nontrivial. --- U.S. - - - - , --- S.Ct. ----, --- L.Ed.2d - - - - , 2010 WL 596513, at \*3 (Feb. 22, 2010) (per curiam). Accordingly, when considering the subjective element of the governing Eighth Amendment test a court must be mindful that the absence of serious injury, though relevant, does not necessarily negate a finding of wantonness since, as the Supreme Court has noted,

[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated.... This is true whether or not significant injury is evident. Otherwise, the Eighth Amendment would permit any physical punishment, no matter how diabolic or inhuman, inflicting less than some arbitrary quantity of injury.

*Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000 (citations omitted); *Velasquez v. O'Keefe,* 899 F.Supp. 972, 973 (N.D.N.Y.1995) ( *McAvoy, C.J.) (quoting Hudson,* 503 U.S. at 9, 112 S.Ct. at 1000); *see Romaine v. Rewson,* 140 F.Supp.2d 204, 211 (N.D.N.Y.2001) (Kahn, J.). Even a de *minimis* use of physical force can constitute cruel and unusual punishment if it is "repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9-10, 112 S.Ct. 1000 (citations omitted).

With its focus on the harm done, the objective prong of the inquiry is contextual and relies upon "contemporary standards of decency." *Wright,* 554 F.3d at 268 (quoting *Hudson,* 503 U.S. at 8, 112 S.Ct. at 1000) (internal quotations omitted)). When addressing this component of an excessive force claim under the Eighth Amendment calculus, the court can consider the extent of the injury

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

suffered by the inmate plaintiff. While the absence of significant injury is certainly relevant, it is not dispositive. *Hudson,* 503 U.S. at 7, 112 S.Ct. at 999. The extent of an inmate's injury is but one of the factors to be considered in determining a prison official's use of force was "unnecessary and wanton"; courts should also consider the need for force, whether the force was proportionate to the need, the threat reasonably perceived by the officials, and what, if anything, the officials did to limit their use of force. *Whitley,* 475 U.S. at 321, 106 S.Ct. at 1085 (citing *Johnson,* 481 F.2d at 1033). "But when prison officials use force to cause harm maliciously and sadistically, 'contemporary standards of decency are always violated.... This is true whether or not significant injury is evident.' " *Wright,* 554 F.3d at 268-69 (quoting *Hudson,* 503 U.S. at 9, 112 S Ct. at 1000). That is not to say, however, that "every malevolent touch by a prison guard gives rise to a federal cause of action." *Griffen,* 193 F.3d at 91 (citing *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993)); *see also Johnson,* 481 F.2d at 1033 ("Not every push or shove, even if it later may seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights").

**\*12** Addressing the objective prong of the Eighth Amendment analysis, the fact that Cicio suffered minor though discernable injuries from the use of force distinguishes this case from others in which the lack of injury has justified summary judgment dismissing excessive force claims under the Eighth Amendment. *See, e.g., Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (the fact that the plaintiff, who claims he was "bumped, grabbed, elbowed, and pushed" by the defendants did not rise to a level of constitutional significance since plaintiff did "not maintain that he experienced any pain or injury as a result of the physical contact"); *Cunningham v. Rodriguez,* No. 01 Civ. 1123, 2002 WL 31654960, at \*5 (S.D.N.Y. Nov. 22, 2002).[FN3] Under the circumstances now presented it would be inappropriate to find, as a matter of law, that objectively plaintiff's injuries were not sufficiently serious to rise to a constitutionally cognizable level.

> FN3. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's

> Note: Appended decisions deleted for Westlaw purposes.]

Turning to the subjective element, the record is devoid of any evidence from which a reasonable factfinder could conclude that this element of plaintiff's excessive force claim against Manna has been met. Rather than representing an unprovoked use of force, by plaintiff's own version, the use of force against the plaintiff occurred during a period of turmoil when one or more disruptive inmates in a group of between sixteen and eighteen combined in a single holding cell became unruly and were being urged to lash out against corrections officers. Plaintiff alleges in his complaint and states in a sworn declaration that he was pushed into a corrections officer by Sergeant Sigona, pulled out of the holding pen by his hair, and thrown to the floor and kneed in the nose. During his deposition, however, plaintiff testified that five or six corrections officers rushed into the holding pen directing him to move to the back, which he could not do because there was no room. Plaintiff's Dep. Tr. at pp. 16 and 51. From there, plaintiff is not exactly sure what happened; he does not know whether he was pushed intentionally, only that "[he] was taken down ... [and] ... kneed in the nose." *Id.* at p. 16. Additionally, at the time of the incident, plaintiff did not know who the officers involved were, who "took him down", or who kneed him in the nose, and could not say whether there were also officers on the floor with him.[FN4] *Id.* at pp. 16-17, 52. Plaintiff further testified that after he fell to the floor, he was lifted and pulled out of the cage by his hair, and then he hit the floor again. *Id.* at p. 18. Again, plaintiff admittedly does not know how he ended up on the floor a second time, or whether he fell or the corrections officers fell on him, although he recalls that he was on the floor with a couple of corrections officers on top of him. *Id.*

> FN4. Plaintiff later learned the names of the officers he identified in his complaint when he received a copy of the misbehavior report that was issued to him as a result of the incident. Plaintiff's Dep. Tr. at p. 17.

Under the circumstances presented, even accepting as true plaintiff's version of the events, when considering the four factors informing the subjective analysis no

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

reasonable factfinder could conclude that the force applied was malicious or sadistic for the purpose of causing plaintiff harm and not in a good faith effort to maintain discipline. Moreover, considering the extent of the force applied and the relatively minor injuries suffered even by plaintiff's account, coupled with the lack of evidence of malicious motives on the part of the corrections officers involved, I recommend a finding that the use of force was truly *de minimis* and did not abridge plaintiff's Eighth Amendment rights.[FN5]

> **FN5.** By plaintiff's own account, the injures suffered as a result of the incident were minor. *See* Plaintiff's Dep. Tr. at pp. 21-26.

### 2. *Failure to Intervene*

**\*13** A corrections worker who, though not participating, if present when an assault upon an inmate occurs may nonetheless bear responsibility for any resulting constitutional deprivation. *See Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994). It is well-established that a law enforcement official has an affirmative duty to intervene on behalf of an individual whose constitutional rights are being violated in his or her presence by other officers. *See Mowry v. Noone,* No. 02-CV-6257 Fe, 2004 WL 2202645, at \*4 (W.D.N.Y. Sept.30, 2004); *see also Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001) ("Failure to intercede results in [section 1983] liability where an officer observes excessive force being used or has reason to know that it will be.") (citations omitted). In order to establish liability on the part of a defendant under this theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration 1) possessed actual knowledge of the use by another corrections officer of excessive force; 2) had a realistic opportunity to intervene and prevent the harm from occurring; and 3) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *See Curley,* 268 F.3d at 72; *see also Espada v. Schneider,* 522 F.Supp.2d 544, 555 (S.D.N.Y.2007). Mere inattention or inadvertence, it should be noted, does not rise to a level of deliberate indifference sufficient to support liability for failure to intervene. *See, e.g., Schultz v. Amick,* 955

F.Supp. 1087, 1096 (N.D.Iowa 1997) (noting that "liability in a § 1983 'excessive force' action cannot be founded on mere negligence") (citing, *inter alia, Daniels v. Williams,* 474 U.S. 327, 335-36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986)).

Based upon my finding that plaintiff's Eighth Amendment rights were not violated through the actions of defendant Manna, there can be no cognizable claim for liability on the part of defendants Sigona and Ruston for failure to intervene and protect plaintiff from the constitutional violation. *See Curley,* 268 F.3d at 72. I therefore recommend that plaintiff's claims against those defendants be dismissed as well.

### C. *Medical Indifference*

The second component of plaintiff's complaint alleges that defendants Vega and Ryerson failed to provide him with needed medical treatment. Plaintiff's claim against Nurse Vega apparently stems from her failure, upon examining Cicio immediately following the March 7, 2006 incident, to arrange for him to see a doctor or to prescribe pain medication. The allegations against defendant Nurse Administrator Ryerson result from her alleged failure to process sick call slips submitted on several occasions following the incident by plaintiff. While plaintiff's summary judgment motion does not speak directly to this claim, he apparently seeks summary judgment on the issue of liability on this claim as well. For their part, defendants urge dismissal of plaintiff's medical indifference claims as a matter of law due to his failure to assert the existence of a serious medical need and additionally for lack of any evidence to satisfy the subjective element of the controlling test.

**\*14** Claims that prison officials have intentionally disregarded an inmate's medical needs are encompassed within the Eighth Amendment's prohibition of cruel and unusual punishment. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291 (1976). The Eighth Amendment's prohibition of cruel and unusual punishment proscribes punishments that involve the "unnecessary and wanton infliction of pain" and are incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley,* 475 U.S. at 319, 106 S.Ct. at 1084 (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

tolerate inhumane treatment of those in confinement; thus the conditions of an inmate's confinement are subject to Eighth Amendment scrutiny. *See Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)).

A claim alleging that prison conditions violate the Eighth Amendment must satisfy both an objective and subjective requirement-the conditions must be "sufficiently serious" from an objective point of view, and the plaintiff must demonstrate that prison officials acted subjectively with "deliberate indifference". *See Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Wilson v. Seiter,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991)); *Waldo v. Goord,* No. 97-CV-1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.); *see also, generally, Wilson,* 501 U.S. 294, 111 S.Ct. 2321, 115 L.Ed.2d 271. Deliberate indifference exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1978; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer); Waldo,* 1998 WL 713809, at *2 (same).

1. *Serious Medical Need*

In order to state a medical indifference claim under the Eighth Amendment, a plaintiff must allege a deprivation involving a medical need which is, in objective terms, " 'sufficiently serious' ". *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) (quoting *Wilson,* 501 U.S. at 298, 111 S.Ct. at 2324), *cert. denied sub nom., Foote v. Hathaway,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). A medical need is serious for constitutional purposes if it presents " 'a condition of urgency' that may result in 'degeneration' or 'extreme pain'." *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) (citations omitted). A serious medical need can also exist where " 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' "; since medical conditions vary in severity, a decision to leave a condition untreated

may or may not be unconstitutional, depending on the facts. *Harrison v. Barkley,* 219 F.3d 132, 136-37 (2d Cir.2000) (quoting, *inter alia, Chance,* 143 F.3d at 702). Relevant factors informing this determination include whether the plaintiff suffers from an injury that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 701 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

**\*15** The record in this case fails to establish that plaintiff experienced a serious medical need of constitutional proportions as a result of the incident complained of. Plaintiff alleges that during the incident he suffered from a swollen and painful wrist as well as head pain. Complaint (Dkt. No. 1) Statement of Facts ¶ 6; *see also* Plaintiff's Dep. Tr. at pp. 21-22, 24-26. The record, including plaintiff's submission in support of his summary judgment motion and later opposition to defendants' motion, fails to provide further elaboration and contains no evidence of any extreme pain or degeneration. Instead, the record discloses only injuries of a transitory nature which are insufficient to establish existence of a serious medical need of constitutional proportions. *Ford v. Phillips,* No. 05 Civ. 6646(NRB), 2007 WL 946703, at *12 (S.D.N.Y. Mar.27, 2007) (finding that minor bruising, slight bleeding, and abrasions are no injuries that may produce death, degeneration or extreme pain and that no reasonable juror could find otherwise).

2. *Deliberate Indifference*

In addition to establishing the existence of a serious medical need, to prevail on an Eighth Amendment claim a plaintiff must also establish indifference to that condition on the part of one or more of the defendants. *Estelle,* 429 U.S. at 104, 97 S.Ct. at 291. Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach,* 103 F.Supp.2d at 546 (citing *Farmer,* 511 U.S. at 837, 114

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

S.Ct. at 1979); *Waldo,* 1998 WL 713809, at \*2 (same).

It should be noted that the Eighth Amendment does not afford prisoners a right to medical treatment of their choosing; the question of which diagnostic techniques and treatments should be administered to address an inmate's medical condition is a "classic example of a matter for medical judgment", and, accordingly, prison medical personnel are vested with broad discretion to determine what method of care and treatment to provide to their patients. *Estelle,* 429 U.S. at 107, 97 S.Ct. at 293; *Chance,* 143 F.3d at 703 (citation omitted); *Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted).

The record now before the court fails to substantiate plaintiff's claims of deliberate indifference. Even if plaintiff could establish the existence of a serious medical need, the record does not provide a basis for a reasonable factfinder to conclude that either defendant Vega or defendant Ryerson was deliberately indifferent to such a need. Plaintiff's claim against Nurse Vega is that on one occasion she failed to provide pain medication or to refer the plaintiff to a physician as a result of his injuries. Such an allegation of a single instance of delayed or denied medical care does not establish constitutional claim of medical deliberate indifference. *See Smith v. Carpenter,* 316 F.3d 178, 186 (2d Cir.2003).

\*16 Turning to the allegations against defendant Ryerson, those stem from an alleged failure to process sick call slips on four or five occasions following the March 7, 2006 incident. Even assuming the existence of a serious medical condition prompting the need for medical care and defendant Ryerson's failure to process sick call slips over a brief period of time, these facts alone do not suffice to establish a deliberate indifference claim as against defendant Ryerson since there is no evidence suggesting that the minimal delay caused any significant adverse effect to plaintiff's health. *See Bumpus v. Canfield,* 495 F.Supp.2d 316, 324 (W.D.N.Y.2007). Accordingly, I recommend dismissal of plaintiff's deliberate indifference claim against defendant Ryerson on this alternative basis.

### D. *Personal Involvement*

In their motion defendants assert that even if plaintiff could establish a cognizable excessive force or deliberate indifference claim, his cause of action against defendant Graham, the superintendent at Auburn, is legally insufficient based upon his lack of personal involvement in any conduct forming the basis for those claims.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282, 55 L.Ed.2d 792 (1978)). In order to prevail on a section 1983 cause of action against an individual a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Importantly, a supervisor like Superintendent Graham cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152-53 (2d Cir.2007), *rev'd on other grounds, sub nom., Ashcroft v. Iqbal,* ---U.S. ----, 129 S.Ct. 2931 (2009); *see also*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)

(Cite as: 2010 WL 980272 (N.D.N.Y.))

*Richardson,* 347 F.3d at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986).

**\*17** In my earlier report and recommendation, addressing a pre-answer dismissal motion filed by certain of the defendants including Superintendent Graham, I recommended against dismissing plaintiff's claim against defendant Graham, finding that the proof at trial could potentially establish that defendant Graham learned, through the appeal of plaintiff's grievance denial, that he was deprived of medical care at a point when he had an opportunity to cure that alleged constitutional deficiency. *See* Report and Recommendation dated February 10, 2009 (Dkt. No. 29) at pp. 17-21. The more fully developed record now before the court, however, firmly establishes that this is not the case. There is no indication that defendant Graham was aware of plaintiff's circumstances prior to plaintiff's appeal on April 12, 2006 of the IGRC's grievance denial. *See* Graham Decl. (Dkt. No. 38-7) ¶ 6. By that point, plaintiff had been transferred out of Auburn, and thus even if defendant Graham was placed on notice of a constitutional deprivation in the form of denial of adequate medical treatment, he was no longer in a position to cure that deficiency. *Id.* Accordingly, because the record fails to disclose any basis on which defendant Graham could be held liable for the constitutional violations alleged, there is an independent, alternate basis for dismissing plaintiff's claims against him.

*IV. SUMMARY AND RECOMMENDATION*

The record in this case discloses no basis on which a reasonable factfinder could conclude that plaintiff's constitutional right to be free from cruel and unusual punishment was violated by defendant Manna during the course of the March 7, 2006 incident and that defendants Sigona and Ruston failed to intervene to prevent such a violation. The record similarly discloses no basis on which a reasonable factfinder could conclude that plaintiff suffered injuries of constitutional significance as a result of that incident or that the defendants were subjectively indifferent to the medical needs presented by those injuries. Finally, the record discloses no basis on which a reasonable factfinder could assign liability on the part of defendant Graham, as superintendent of the Auburn Correctional Facility. Accordingly, it is hereby

respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 38) be GRANTED and that plaintiff's complaint be dismissed in its entirety, and that based upon that determination plaintiff's summary judgment motion (Dkt. No. 35) be DENIED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2010.

Cicio v. Graham
Not Reported in F.Supp.2d, 2010 WL 980272 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.